TRUSTEES OF EAST NORWAY LAKE NORWEGIAN EVANGELICAL LUTHERAN
CHURCH and others *vs.* JOHANNES Z. HALVORSON and others.

Febraary 10, 1890.

42 503
48 494

Ejectment by Corporation—Trial of Right of Claimants to Corporate
Offices.—In an action of ejectment, by a corporation of which there
are contesting claimants to the offices, upon an answer alleging that the
defendant is in possession under one set of claimants, the court, while it
cannot render judgment, as between the claimants, so as to exclude one
set and put another into the offices, will determine whether the set which
let defendant in were officers of the corporation.

Corporation—De Facto Officer.—One cannot be a *de facto* officer unless
he is acting as such, under color of having been rightfully elected or ap-
pointed.

Religious Corporation—De Facto Officer—Color of Title.—In the case
of a church congregation, if a minority, not acting within the regular or-
ganization, get together and assume to elect trustees, it has not the color
of an election by the congregation.

Same—Property Rights Depending on Questions of Doctrine.—Civil
courts never assume to determine the abstract truth or falsity of any
religious doctrine.   The most they can do is, when rights of property are
dependent on adherence to, or teaching of, a particular religious doctrine,
to examine what, as a fact, the doctrine is, and whether, as a fact, the
particular person adheres to or teaches it.

Same—Effect of Decision of Church Tribunal.—When the contract pro-
vides, or by implication contemplates, that what is according to or con-
sistent with the particular doctrine shall be determined by some religious
judicatory, the determination of such judicatory, duly made, when the
matter is properly brought before it, is conclusive on the civil courts.

Same—Constitution of Congregation.—In the case of a religious congre-
gation, what are the doctrines, adherence to which is a condition of mem-
bership, must be determined by reference to the rules, constitution, or
by-laws of the congregation.

Same—Differences in Interpretation of Standard of Doctrine.—Where
a congregation, in its constitution, adopts certain books as the exponents
of its faith and doctrine, and there subsequently arise honest differences
of opinion as to the interpretation of the statements of doctrine in such
books, and the constitution is silent as to such matter of interpretation,

and provides no mode for determining the differences, the civil courts will not hold that adherence to either interpretation dissolves, *ipso facto*, a member's connection with the congregation, so that he ceases to be a member of the corporation it has formed to hold and control its property.

Appeals by defendant and intervenors from a judgment of the district court for Kandiyohi county, where the action was tried by *C. L. Brown*, J., acting for the judge of the 12th district.

*Hawes, Lomen & Scofield*, for appellants.

*James O. Pierce* and *Arctander & Arctander*, for respondents.

GILFILLAN, C. J. From 1866 to 1877, there existed at or near Norway Lake, in what is now the county of Kandiyohi, in this state, an incorporated religious congregation called the "Norwegian Evangelical Lutheran Congregation." In 1877 the persons composing this congregation divided by consent into two congregations, each of which then became duly incorporated under the statute, one by the name of the "Trustees of the East Norway Lake Norwegian Evangelical Lutheran Church of Kandiyohi County, Minnesota," and the other by the name of the "Trustees of the West Norway Lake Evangelical Lutheran Church of Norway Lake, County of Kandiyohi, and State of Minnesota." These two corporations still continue, and they are the plaintiffs in this action. The two corporations acquired as tenants in common, apparently soon after their incorporation, certain real estate, including that in controversy. They appear to have employed one common pastor, and to have used the real estate in controversy as a parsonage. It does not appear that in the deed conveying the real estate to the two corporations there was expressed any trust or use for which the property was to be held.

About 1885, differences of opinion upon certain matters of doctrine had arisen and existed, and still exist, among the members of each of the two congregations. It appears that those holding one set of opinions on these matters of difference, in each of the congregations, were a considerable majority of the congregation. Such majority in each, claiming to be the congregation, held meetings from time to time, which they claimed to be legal meetings of the congregation, and which were so, unless they had ceased to be members of the congregations by reason of the opinions they held upon the matters of

doctrine referred to. From these meetings no member of the minority was excluded, though the meetings ignored the claim of the minority, as a body, to be the congregation. At these meetings, trustees for each corporation were elected from time to time, as vacancies occurred, thus keeping up a regular succession of trustees from the organization of the congregations, and other business was transacted, including the dismissal of the prior pastor, who held the opinions of the minority on the matters of difference, and the calling of another in his stead. The minority in each congregation also held meetings from time to time, which they, assuming that the majority had ceased to be members of the congregation by reason of holding opinions which the minority regarded to be heretical, claimed to be the meetings of the congregation; and at such meetings they transacted business, called a pastor, and from time to time they elected trustees. And so it came about that there were, and are now, for each congregation, two sets of trustees,—the majority trustees, who are in continuation of the original organizations, and the minority trustees; each set claiming to be the lawful trustees of the corporation. The pastor called by the minorities was the defendant Halvorson, who was put in possession of the real estate in question by the minority trustees. The majority trustees, having demanded of him the possession, and he having refused to surrender it, caused this action to be brought, in the name of the plaintiff corporations, to recover possession of it.

The minority trustees have intervened in the action, asking that it be dismissed; that they and their associates be adjudged to be the rightful congregations of East and West Norway Lake; and that the title to the offices of trustees, as between them and the majority trustees, be determined in their favor. They seek, indeed, to turn this, a simple action in ejectment, into a proceeding, in the nature of *quo warranto*, to test the title to a corporate office. This, of course, cannot be done. If there was no other reason why it cannot, this would be conclusive—that the opposing claimants to the offices, the majority trustees, are not parties to the action.

But while the question of title to the office cannot be directly and authoritatively determined, so as to oust the intruders and put the

rightful claimants in possession, it may be necessary to pass upon it as incidental to another and a proper issue in the case. The defendant Halvorson, in his answer, alleges that the minority trustees were the legal trustees of the corporations; that he was put in possession by them, and is in possession under their authority. If these allegations ne true, he is in under and by authority of the plaintiffs, and that would be a defence. So that, as part of that defence, and as between him and the plaintiffs, it is necessary to consider and determine whether the minority trustees were lawful officers of the corporations; and this will make it necessary to determine which of the two sets of meetings, those of the majority or those of the minority, were the lawful meetings of the congregations.

The defendant argues that as the minority trustees are *de facto* officers, and as they are in possession, an action to put the rightful trustees in possession will not lie until in a proper proceeding, as by *quo warranto*, the right to the office is first determined. But, *first*, the minority trustees are not in possession of the land. If Halvorson is rightfully in, his possession is that of the corporations. He is not, whether rightfully or wrongfully in, possessing the land as the tenant or agent of the persons who put him in. The minority trustees could not, in their own names, maintain an action to recover the premises from him. And, *secondly*, to determine that they are *de facto* trustees, it will be necessary to determine the point on which their claim to be legal trustees depends. To make one a *de facto* officer, it is not enough that he claims to be an officer, or that some people think him an officer, or that he assumes to act as such. He must be acting as an officer under color of having been rightfully elected or appointed. Now, unless it be true that the minorities constituted the congregations, and that their meetings were meetings of the congregations, then there was no semblance of an election by the congregations, the bodies entitled to elect. Take the case of a congregation composed of 1,000 members, of whom 40 or 50 should get together, assume to excommunicate the others or declare them no longer members, and assert themselves to be the congregation, and proceed to elect officers. That would have no color of an election by the congregation of 1,000 members, nor by any body having a right

to elect for that congregation. Such a case is more extreme than this, in that the difference in numbers between the original congregation and the seceders is greater, but the principle applicable to the cases is the same. In either case, the meeting of the minority, whatever they might claim for themselves, would not have the appearance of a meeting of the original body, and its acts would not appear to be the acts of such original body. To give to their acts the appearance of acts of the congregations, it was necessary that the persons meeting, the minorities, should be the then existing congregations; a thing which is not claimed, if the majorities were still members of the congregations. So that, to decide whether the minority trustees were either *de jure* or *de facto* officers of the corporations, we must determine whether in law the bodies which elected them were the congregations.

The defendant claims that the minorities were the lawful congregations because, as he asserts, the majorities had departed from the true doctrines, adherence to which was, according to the constitution of the two (local) churches, the bond that was to hold the congregations together, and had adopted views of doctrine which, according to such constitutions, were heretical; and that they thereupon, *ipso facto*, ceased to be members of the congregations; and that that left the minorities, who adhered to the true doctrines, the only members of the congregations,—the only bodies or persons who had any rights in the property held by the corporations for the use and benefit of the legal congregations, or any rights in the government of the corporations.

Civil courts take up matters of religious doctrines with extreme reluctance. They never do so—it is beyond their province to do so—for the purpose of determining the abstract truth or falsity of any religious doctrine; and they never consider them at all except where civil rights, rights of property or contract respecting the holding, control, use, or enjoyment of property, are dependent on them. Thus, where by contract the right to hold, control, use, or enjoy property depends upon an adherence to, or teaching of, a religious doctrine, the civil courts will examine what, as a matter of fact, the doctrine is, and whether, as a matter of fact, this or that person adheres to or

teaches it. But they will go no further than is necessary to determine the question of fact. The proposition that the courts will make such examination as of a matter of fact must be understood in connection with this other proposition, that where the contract provides, or by implication contemplates, that the question what is according to, and consistent with, the particular doctrine or doctrines shall be determined by some church judicatory, the determination of such judicatory, duly made when the matter is properly brought before it, will be conclusive upon the civil courts. And this is so, not because the law recognizes any authority in such bodies to make any decision touching civil rights, but because the parties, by their contract, have made the right of property to depend on adherence to, or teaching of, the particular doctrines as they may be defined by such judicatory. In other words, they have made it the arbiter upon any questions that may arise as to what the doctrines are, and as to what is according to them.

Where a number of persons associate to form a religious congregation, to acquire property for its use, and incorporate for the more convenient holding and control of the property, the constitution or body of rules which they adopt to prescribe who shall be members of the corporation, and entitled to a share in the control of it, is the contract by which they are bound. The right to a share in the government of a corporation is a civil right, which the law will protect, and the courts will therefore determine who are members of the corporation. And where, as is usually the case with local church organizations, and as is the case here, all the adult male members of the religious body, the congregation, and no others, are members of the corporation, so that when one becomes a member of the religious body he becomes a member of the corporation, and when he ceases to be a member of the religious body he ceases to be a member of the corporation, and has no further rights in it and in the property owned by it, the court, to determine on the civil right claimed,—that to be a member of the corporation,—must determine on membership in the religious body, the congregation. And it must determine this by the rules which the congregation has adopted for its membership. If the rules make adherence to particular doctrines a condition of mem-

bership, then, so long as those rules continue, the repudiation of such doctrines would seem to determine a member's right to remain in the congregation.    Whether, when one has been admitted a member of a congregation, a civil court will consider the matter of his adherence to such doctrines, or will leave it to the proper religious tribunal,—the congregation, if there be no other,—is not in this case necessary to determine; for it is not shown that the majorities of the congregations ever departed from the doctrines, adherence to which was, by the rules adopted by the congregations, made a condition of membership.    The controversy between the majorities and minorities was upon the interpretation or understanding of certain dogmas set forth in what is known among Norwegian Lutherans as the "Book of Concord," which had been adopted by these congregations as one of the exponents of their religious faith and doctrines.    Each party acknowledges the authority of that book, and professes adherence to the doctrines taught by it.    Each claims that its is the right interpretation of those doctrines.    Learned ministers and professors among the Norwegian Lutherans differ as to which is the true interpretation.    There is no reason to doubt that each party insists upon its interpretation in good faith, and fully believing it to be consistent with the Book of Concord.    Unless it has been done by action of the majorities since the differences arose, about 1885, these congregations have never prescribed adherence to either interpretation as a condition of membership. The constitutions of the congregations do not.    These constitutions are designated "by-laws," divided into 28 sections.    By section 3, the congregations acknowledge God's holy word, revealed in the canonical books of the Old and New Testaments, as the only rule of faith, doctrine, and life.    By section 4, they adopt the Evangelical Lutheran confession of faith, found in the Book of Concord, as a pure and unadulterated statement of the doctrine of God's holy word. The by-laws do not refer to nor adopt any particular interpretation of any doctrine stated in the Book of Concord, nor provide any means for determining differences that may arise as to the meaning of the statements of doctrine in it.    Ordinarily, an independent religious society, which does not acknowledge any superior or other religious

tribunal as having the right to authoritatively define for it matters of doctrine, must do so for itself. But these congregations, while not acknowledging it in any other body, seem to disclaim that power. Section 13 of the by-laws provides: "The congregation, in its entirety, has the supreme power in the external and internal management of all church and congregational affairs; but the congregation has not the power to ordain or direct anything contrary to the word of God and the symbolical books." And section 19: "Questions of doctrine or conscience cannot be decided by vote, but only by the word of God, and the symbolical books." Section 25 seems to reserve the power to expel members " conformably to the word of God." Section 26 provides that in case of a division of the congregations the property shall belong " to that portion which faithfully adheres to these by-laws, to the word of God, and to the symbolical books, according to the views now held by the Norwegian synod." It is urged on behalf of the defendant that under this by-law, as the minorities adhere, and the majorities do not, to these things according to the views then held by the synod, the minorities are entitled to the property; that is, that, so far as affects rights of property, they are the congregations. But, as appears by its constitution (see section 3, c. 1) in force when these congregations were organized and their by-laws adopted, the synod had as a rule of faith, in addition to the Old and New Testaments, only the Apostolic, Nicene, and Athanasian creeds, the unaltered Augsburg Confession and Luther's Smaller Catechism. The Book of Concord is not placed among the symbols. So that the synod cannot be said to have had any views upon the question of interpretation upon which these parties differ. The relation between the synod and the congregations (these congregations belonging to it) seems peculiar. The former body does not assume any authority to define doctrine for the congregations. By section 6, c. 5, of its constitution, its meetings are declared to be merely advisory, so far as the congregations are concerned; and section 4, Id., declares that " questions of doctrine and conscience cannot be determined by a plurality of votes, but only according to the word of God and the symbolical books of our church."

The synod, and the congregations sending delegates to it, are merely

religious bodies, in the organization, control, and government of which, as such, the civil tribunals have nothing to do. It is for the synod to determine when and for what cause it will sever its connection with any congregation; and for the congregation, considered merely as a religious association, to determine when it will expel a member. Of course, and in the nature of things, it must be by vote, even though the cause assigned be matter of doctrine.

But to return to the constitution (by-laws) of these congregations. While adherence to the doctrines adopted by them may be considered as conditions of becoming or remaining a member, it is not so with any new matter of doctrine that may arise, or with any honest interpretation of the statements of former doctrines. We infer from the by-laws that such come within the disclaimer in section 19, and belong, not to the congregations, but to the individual conscience of each member, so that it was not intended that any member should be responsible to the congregation for his views upon them. A civil court, therefore, could not determine that by adopting any particular opinion of such new doctrine or such interpretation a member, *ipso facto,* ceases to be a member of the congregation, so as to lose his rights in the corporation.

Judgment affirmed.

NOTE. A motion for a reargument of this case was denied April 1, 1890.