TED BLAUERT AND ANOTHER, AS TRUSTEES OF AND IN BEHALF OF ST. JOHNS EVANGELICAL LUTHERAN CHURCH, v. REV. FRANCIS Q. SCHUPMANN AND OTHERS, AS MEMBERS AND IN THE NAME OF THE ORTHODOX LUTHERAN CONFERENCE CHURCH CONGREGATION.[1]

March 19, 1954.

No. 36,185.

---

[1]Reported in 63 N. W. (2d) 578.

*C. U. Landrum,* for appellants.

*A. O. Sletvold,* for respondents.

THOMAS GALLAGHER, JUSTICE.

This case arises out of a controversy between two factions in St. Johns Evangelical Lutheran Church, hereinafter referred to as St. Johns Church, in Height of Land township, Becker county. Plaintiffs, Ted Blauert and Erwin Wothe, as trustees of the church, on behalf of the congregation seek judgment enjoining defendants from interfering with their possession and use of the church property, including the parsonage. They charge that defendant Francis Q. Schupmann had been discharged as pastor of the church but that, notwithstanding this, he and other defendants, contrary to the constitution under which the church was organized, prevent plaintiffs from using the church property.

On February 4, 1953, the district court made findings and ordered judgment in substance determining that defendant Francis Q. Schupmann had been legally discharged as pastor by the church congregation and permanently enjoined him from occupying the parsonage or interfering with the use and benefit of the church property by all members of the congregation. Subsequently, defendants' alternative motion for amended findings or a new trial was denied. This is an appeal from the order denying the motion for a new trial.

On appeal, as in the trial court, defendants challenge the jurisdiction of the civil courts to determine the issues presented; further

assert that the evidence clearly established that defendant Francis Q. Schupmann was not legally discharged as pastor; and contend that he and other defendants are entitled to full use of the church property, including the parsonage.

The facts are as follows: St. Johns Church was organized about 1890 by adoption of a written constitution, which included the following:

"2.

"This congregation accepts and acknowledges all the canonical books of the Old and the New Testaments as the inspired word of God, and all the Symbolical Books of the Evangelical Lutheran Church contained in the Book of Concord as a true and sound exhibition of Christian doctrine taken from and in full agreement with the holy Scriptures; and in this congregation no doctrine shall be taught or tolerated which is at variance with the verbally inspired Word of God and the Symbols of the Evangelical Lutheran Church as contained in the Book of Concord. * * *

"3.

"No one can be or remain a member of this congregation or hold an office in the same, or enjoy and exercise the rights and privileges of a member, but such as

* * * * *

"e, together with the congregation partake of the Lord's Supper with due frequency, if they be of sufficient age;

* * * * *

"h, * * * contribute according to his ability toward the maintenance of church and school * * *.

"In matters of doctrine and conscience unanimity shall be required for a final decision; other matters shall be disposed of by the votes of a majority of the voting members present at a meeting properly convened.

"4.

"When a member of this congregation * * * shall have been expelled from the congregation, such excommunicated person shall then have forfeited all rights of a member of this congregation and

all claims upon the property of the congregation as such or upon any part thereof . * * *

"5.

"The congregation as a body shall have the supreme power in the external and internal administration and management of its own ecclesiastical and congregational affairs. * * *

"6.

"a. The right of choosing and calling ministers * * * shall ever be vested in the congregation and shall never be delegated to an individual or to a minor body within the congregation.

"b. The pastoral office in this congregation shall be conferred upon such ministers or candidates only as profess their acceptance of and adherence to all the canonical books of the Old and the New Testaments as the inspired word of God, and all the Symbols of the Evangelical Lutheran Church * * * and who have been examined and recommended by a synod which is a member of the Synodical Conference.

*     *     *     *     *

"8.

"It shall be the duty of the duly elected trustees to have charge of the property of the congregation entrusted to their care. * * *

"9.

"If at any time a separation should take place in this congregation on account of doctrine, * * * the property of the congregation * * * shall remain with those members who shall continue to adhere to the verbally inspired word of God, Luther's Small Catechism, and the Unaltered Augsburg Confession as set forth in Articlt [sic] 2, and who will accept such pastors and teachers only as set forth in Article 6 (six) of this Constitution.

"The property of the congregation can never be claimed by any group or circle which does not abide in doctrine and practice by the Word of God and the Confessions of the Evangelical Lutheran Church, Synodical Conference.

"10.

"To transact business and pass valid resolutions at least one-fourth of the voting members must be in attendance. In matters

of doctrine and conscience unanimity shall be required for a final decision; other matters shall be disposed of by the votes of a majority of the voting members present at a meeting properly convened."

No bylaws were ever adopted.

Subsequent to its organization, the church acquired real property, constructed church and parsonage buildings thereon, and established a cemetery in Becker county. In 1925, by action of the congregation, it affiliated with the Missouri Synod of the Lutheran Church, and, up to the time of this proceeding, it continued affiliation therewith.

On March 7, 1949, the congregation issued a "Solemn Call" to the defendant Francis Q. Schupmann to serve as its pastor, which he accepted. On July 28, 1949, he was thus installed. He is a graduate of Concordia College in St. Louis, Missouri, operated under the Missouri Synod, and became a pastor of that synod at the time of his installation as above.

On June 29, 1950, the Lutheran Church, Missouri Synod, adopted what was designated as the "Common Confession," in substance a statement or summary of various of its doctrines. This was later adopted or approved by the American Lutheran Church as a preliminary step toward a possible union of these two organizations. Thereafter, a few pastors affiliated with the Missouri Synod contended that the "Common Confession" constituted a departure from the doctrines of the Missouri Synod; but the great majority of pastors affiliated with the Missouri Synod held that the "Common Confession" did not constitute changes of doctrine but, rather, only changes in phraseology expressing such doctrines.

After the adoption of the "Common Confession," Reverend Schupmann concluded that as a result thereof the Missouri Synod was teaching "false doctrines." He thereupon called study classes in St. Johns Church to explain his position. Therein he urged members of his congregation to disaffiliate with the Missouri Synod and to affiliate with the Orthodox Lutheran Conference, an organization comprised of Lutheran pastors who, like himself, believed the Missouri Synod in the adoption of the "Common Confession" had departed from its fundamental doctrines. Dissension among members

of the congregation followed. A meeting of the congregation was called and a resolution adopted requesting him to desist from his efforts and to cease holding study classes in the church. The congregation divided into two hostile factions.

At the regular semiannual meeting of the congregation held May 21, 1952, attended by some 26 voting members of the congregation, a resolution was carried, 16 to 10, which deposed Reverend Schupmann as pastor of the church and which reaffirmed the congregation's desire to remain affiliated with the Lutheran Church, Missouri Synod. He refused to recognize the validity of this resolution. At his request, some 10 members of the congregation, including all defendants here, remained after the regular meeting and adopted the following resolution:

"A motion was made, seconded and carried that the church be locked when not in use by this congregation.

"A motion was made, seconded and carried that in obedience to God's Word * * * that St. John's Lutheran Church join the Orthodox Lutheran Conference and drop its membership and sever its fellowship with the Lutheran Church, Missouri Synod.

"A motion was made, seconded and carried that we turn all mission money over to the Orthodox Lutheran Conference."

Immediately following this meeting, locks which previously had been purchased were placed upon all church property, and all members of the congregation, other than those present at the latter meeting, were denied admission thereto. These proceedings followed.

It is conceded by Reverend Schupmann that he is now affiliated with the Orthodox Lutheran Church, that his previous association with the Missouri Synod has been severed, and that defendants have joined with him in such affiliation.

■ We are of the opinion that the court had jurisdiction to determine the issues presented. There is nothing in the constitution of St. Johns Church which authorizes a procedure whereby members of the congregation can determine rights in the real or personal property owned by the church. This being true, resort must be made to the civil courts when a dispute arises with reference to the owner-

ship or use thereof. As stated in East Norway Lake Church v. Halvorson, 42 Minn. 503, 508, 44 N. W. 663, 665:

"Where a number of persons associate to form a religious congregation, to acquire property for its. use, and incorporate for the more convenient holding and control of the property, the constitution or body of rules which they adopt to prescribe who shall be members of the corporation, and entitled to a share in the control of it, is the contract by which they are bound. The right to a share in the government of a corporation is a civil right, which the law will protect, and the courts will therefore determine who are members of the corporation."

See, Russian-Serbian Holy Trinity Orthodox Church v. Kulik, 202 Minn. 560, 279 N. W. 364; Annotations, 70 A. L. R. 76 and 49 L. R. A. 393, 394.

■ There is nothing in either the constitution or the "Solemn Call" under which defendant Schupmann was employed as pastor which specifies any definite term during which he was thus to serve. The only obligation placed upon the congregation under the terms of the "Solemn Call" was to "accord him * * * honor, love, and obedience * * *, to support his ministrations * * *; to render the discharge of his duties easy * * *; to provide for his decent maintenance * * *." Obviously, such a contract is governed by the principles applicable to other employment contracts terminable at will.

Article 6 of the church constitution vests in the congregation the right to choose its ministers. The constitution, having conferred upon the congregation the right to employ pastors, by implication would vest in it the right to discharge them. There is nothing therein which requires, as defendants contend, that either the employment or discharge of a pastor be by unanimous vote. While it does require unanimity on matters of doctrine and conscience, no such provision extends to the employment or discharge of a pastor. It follows that the congregation at any time might terminate the employment of a pastor either with or without cause. While in the instant case the basis for the pastor's discharge was the dissension created by virtue

of his charges against the Missouri Synod, this in itself would not establish that a reason for such discharge be required or that a charge thus brought be proved. It would be sufficient if in the minds of a majority of the congregation his conduct with respect to such matters was such that his further employment would be contrary to the best interests of the church. See, Walker Memorial Baptist Church, Inc. v. Saunders, 173 Misc. 455, 17 N. Y. S. (2d) 842; Sance v. Monroe (La. App.) 39 So. (2d) 174; Stubbs v. Vestry of St. John's, 96 Md. 267, 53 A. 917; Morris Street Baptist Church v. Dart, 67 S. C. 338, 45 S. E. 753, 100 A. S. R. 727.

■ Defendants assert that, since there was no notice that the discharge of the pastor was to be considered at the May 21, 1952, meeting, the action taken with respect thereto was invalid. No authority is cited in support of this contention. That it was the regular semiannual meeting of the church called for the purpose of acting upon matters concerning church affairs is not disputed. There is nothing in the constitution which requires that any particular form of notice be given for such meetings or that notice thereof contain statements as to specific business to be conducted thereat. It was attended by Reverend Schupmann and his supporters, who made no protest to the effect that it was not a valid meeting.

There is substantial evidence that Reverend Schupmann was well aware that the termination of his contract would be considered at the meeting. In anticipation of what would happen, he had directed members of his faction to bring locks with them so that the church doors might be locked immediately after the meeting. He brought with him two written protests to be submitted in opposition to the resolution calling for his discharge.

It is clear from the foregoing that the meeting was validly called; that the business conducted thereat was proper business of the church; and that the consideration and passage of the resolutions described were well within the functions of such a meeting. 45 Am. Jur., Religious Societies, § 20; Annotation, 35 L.R.A.(N.S.) 921, 924.

■ It is also suggested by defendants that some of the members present at the meeting were not qualified voters of the church

because the records failed to disclose that they were frequent communicants or had contributed to the church, as required by article 3 of the constitution. There is no dispute, however, that each of the members in attendance voting on the resolution discharging Reverend Schupmann had previously been duly accepted as members of this church congregation. It would follow that, until their respective memberships therein had been terminated pursuant to article 4 of the constitution, their qualifications as such could not be challenged. The latter section provides that:

"When a member of this congregation, after fruitless admonition in the various grades prescribed by the word of God * * * shall have been expelled from the congregation, *such excommunicated person shall then have forfeited all rights of a member of this congregation and all claims upon the property of the congregation * * *.*" (Italics supplied.)

None of the members present at the May 21, 1952, meeting had been excommunicated from membership. Their rights, therefore, as such members, including the right to vote at regular meetings, continued as did their claims upon the property of the congregation. It is true that they had not been communicants with the frequency deemed desirable by Reverend Schupmann and that they had not made contributions to the extent deemed sufficient by him; but their testimony is clear that their failures in this respect were occasioned by their belief that he had departed from the doctrines embodied in article 2 of the constitution and had severed his affiliation with the Missouri Synod to which they desired to adhere. That such conclusions were on solid ground appears manifest by the subsequent actions of Reverend Schupmann in completely withdrawing from the Missouri Synod and affiliating with the Orthodox Lutheran Conference. When these factors are considered, it seems clear that those present at the May 21, 1952, meeting were qualified voting members authorized to act and vote on church matters presented at the meeting. 45 Am. Jur., Religious Societies, § 17.

■ Defendants finally contend that the actions taken at the meeting of May 21, 1952, were invalid under article 10 of the constitution

in that less than one-fourth of the voting members of the congregation were in attendance. This question was not raised at the meeting nor during the trial below. There, Reverend Schupmann testified that he did not know the actual number of voting members in the congregation. The treasurer's record established that in 1951 a total of 123 persons contributed to the church, 31 of whom were women; and that in 1952, 124 persons were listed as contributors, of which 34 were women. This would indicate that in 1951 there were 92 men listed as members and that in 1952 there were 90 men in that category. The constitution, as construed by the congregation for many years, permits only male members to vote at church meetings. From the foregoing it would follow that the 26 voting members present at the meeting of May 21, 1952, constituted more than one-fourth of the voting membership of the congregation and, hence, were authorized under article 10 thereof to act on church matters presented for consideration at the meeting. Incidentally, the minute book indicates that this number was substantially in excess of the number usually in attendance at such meetings. 45 Am. Jur., Religious Societies, § 21.

■ It seems clear that defendants seek to sever finally the affiliation of St. Johns Church with the Missouri Synod and to take with them its property to the Orthodox Lutheran Conference. The contention that the "Common Confession" constituted a departure from previous doctrines was vigorously denied by many ministers of the Missouri Synod who appeared and testified in the proceedings. Reverend Schupmann was the only minister who testified to the contrary. Such evidence lends support to our conclusion that Reverend Schupmann, by his actions, violated articles 9 and 10 of the church constitution. As this court stated in Rock Dell Norwegian E. L. Congregation v. Mommsen, 174 Minn. 207, 212, 219 N. W. 88, 90:

"A church organization * * * cannot change its fundamental faith or religion for the promotion of which it was organized and devote its property to a different faith without the consent of all its members. The property which it owns is charged with a trust, though not expressed in the instrument by which it is acquired.

It is to be devoted to the fundamental faith or doctrine of the church, and cannot be changed as against the protest of a single member. Schradi v. Dornfeld, 52 Minn. 465, 55 N. W. 49; Lindstrom v. Tell, 131 Minn. 203, 154 N. W. 969; Mattson v. Saastamoinen, 168 Minn. 178, 209 N. W. 648."

The order appealed from is affirmed.

[1]Reported in 63 N. W. (2d) 585.