## RAMSEY ET AL. v. HICKS ET AL.

[No. 21,608.   Filed March 31, 1910.   Rehearing denied June 28, 1910.]

1. COURTS. — *Jurisdiction.* — *Ejectment.—Churches.* — Civil courts have jurisdiction of the subject-matter of an action in ejectment by one church against another.   p. 431.

2. RELIGIOUS SOCIETIES.—*"Presbyterianism."*—The name "Presbyterianism" implies a system of church government embodying the belief that the management of the new testament church is in the hands of representatives of the people called presbyters, and imports a polity of representative government and the doctrines of Calvinism.   p. 432.

3. RELIGIOUS SOCIETIES.— *Property.— Ecclesiastical Decisions.— Civil Courts.*—Where a congregation of the Cumberland Presbyterian Church brings an action in ejectment to recover their church building and property from the Presbyterian Church in the United States of America, after the alleged union of such churches, the civil courts will regard as conclusive the action of a majority of the Cumberland Presbyterian general assembly in declaring the union of such churches, the rights of property being merely incidental to such ecclesiastical decision.   pp. 440, 456.

4. RELIGIOUS SOCIETIES.—*Ecclesiastical Decisions.—Jurisdiction.*— Ecclesiastical decisions made under color of authority and in manifest good faith, are conclusive, upon civil courts, both as to the ecclesiastical jurisdiction and as to the question decided. p. 442.

5. RELIGIOUS SOCIETIES.—*Property Rights.—When Determined by Civil Courts.*—Where property rights arise in a religious society, and there is no church judicatory, the civil courts have jurisdicton to determine the rights of the parties.   p. 444.

6. RELIGIOUS SOCIETIES.—*Ecclesiastical Questions.—Civil Courts.— Jurisdiction.*—The civil courts have no jurisdiction over ecclesiastical questions; and membership in an unincorporated religious society does not constitute a civil or valuable right within the meaning of the law.   *Hatfield* v. *DeLong*, 156 Ind. 207, overruled. *Smith* v. *Pedigo*, 145 Ind. 361, distinguished.   p. 445.

7. RELIGIOUS SOCIETIES.—*Beneficial Associations.—Similarity.*—A religious society is not governed by the same principles as a beneficial association, since the one is "founded upon a distinctive conception of the relation and duty of man to his Maker, and the other is concerned only with the relation of man to his fellows."   p. 446.

8. RELIGIOUS SOCIETIES.—*Cumberland Presbyterian General Assembly.—Powers.—Decisions.*—The Cumberland Presbyterian general assembly's decision that the confession of faith of the Pres-

byterian Church in the United States of America, as revised in 1903, was in substantial accord with doctrines of the Cumberland Presbyterian Church, is conclusive upon the civil courts, as well as the members of such church, section forty-three of the constitution of such church empowering such general assembly "to decide all controversies respecting doctrine and discipline." p. 446.

9. RELIGIOUS SOCIETIES.—*Seceders.*—*Rights of.*—The members of the Cumberland Presbyterian Church who refused to unite with the Presbyterian Church in the United States of America according to the decision of the general assembly of such church can retain their property and rights only by showing that the acts of the general assembly were clearly unconstitutional and *ultra vires*, and failing therein, they must be treated as seceders. p. 446.

10. RELIGIOUS SOCIETIES.—*Objects.*—*Property.*—The primary object of a religious association is to worship, possession of property being a necessary incident; but a church member has no private nor pecuniary interest in church property. p. 447.

11. RELIGIOUS SOCIETIES.—*Presbyterianism.*—*Representative Government.*—The Presbyterian system of church government is not that of a democracy, but is republican and wholly representative. p. 447.

12. CONSTITUTIONAL LAW.—*Annexing Territory.*—The federal government has inherent power to annex territory and peoples. p. 448.

13. RELIGIOUS SOCIETIES.—*Cumberland Presbyterian Church.*—*Constitution.*—*Powers of General Assembly.*—Section twenty-five of the constitution of the Cumberland Presbyterian Church, providing that "the jurisdiction of these courts [the church session, the presbytery, the synod and the general assembly] is limited by the express provisions of the constitution," was designed to fix the limits, as between themselves, of such courts, and did not circumscribe the sovereign power of the church itself so as to prevent such bodies, without the sanction of the membership of the church, from forming a union with another church, the church having from its birth entertained a desire to unite with some other church. pp. 448, 449.

14. RELIGIOUS SOCIETIES.—*Presbyterianism.*—*General Assembly.*—*Implied Powers.*—The general assembly of the Cumberland Presbyterian Church being the highest official body in such church, had the implied power to unite such church with the Presbyterian Church in the United States of America. pp. 449, 450.

15. RELIGIOUS SOCIETIES.—*Unions.*—*Sanction.*—The union principle among churches has scriptural sanction, and was advocated by Calvin. p. 449.

16. RELIGIOUS SOCIETIES.—*Presbyterians.*—*General Assembly.*—*Unions.*—The general assembly of the Cumberland Presbyterian

Church, empowered "to receive under its jurisdiction other ecclesiastical bodies," has the implied right to join another body. p. 450.

17. RELIGIOUS SOCIETIES.— *Union.— Effect.*— The union of one church with another does not extinguish either, but both live in the new body. p. 454.

18. RELIGIOUS SOCIETIES.—*Union.—Name.*—Where the highest governing body of a church has power to unite such church with another, such body has implied power to establish the mode of procedure, and to agree to the name of the new church. p. 454.

19. DEEDS.—*Religious Societies.—Trusts.—Civil Courts.*—A deed to a church constitutes a civil contract and it is the duty of the courts to construe its meaning and legal effect. p. 455.

20. DEEDS.—*To Church.—Trusts.*—A general warranty deed to the trustees of a congregation of the Cumberland Presbyterian Church creates no trust, and the only duty of the court in a controversy thereover, as to the rightful owner, after an alleged union of such church with another, is to determine the rightful successor. pp. 455, 456.

21. RELIGIOUS SOCIETIES.— *Union.— Seceders.— Rights.*— When the general assembly of the Cumberland Presbyterian Church decided that a union of such church and the Presbyterian Church in the United States of America had been consummated, the property of the former vested in the latter, and the members of the former who refuse to unite have no interest in the church property. p. 456.

22. APPEAL.—*Transfer.—Oral Argument.*—An oral argument in a case on a petition to transfer from the Appellate Court will be granted only when the Supreme Court desires it. p. 457.

From Superior Court of Vanderburgh County; *Alexander Gilchrist,* Judge.

Action by James W. Ramsey and others against Joseph P. Hicks and others. From a judgment for defendants, plaintiffs appeal. Transferred from Appellate Court (see 44 Ind. App. 490) under §1394 Burns 1908 subd. 2, Acts 1901 p. 565, §10. *Affirmed.*

*William Reisler, George W. Shaw, W. C. Caldwell* and *Heffernan & Mattingly,* for appellants.

*A. P. Humphrey, John M. Gaut, Joel E. Williamson, Ogdon & Inman* and *Hastings, Allen & Hastings,* for appellees.

MONTGOMERY, J.—Appellants as trustees of the Washington congregation of the Cumberland Presbyterian Church,

in Daviess county, Indiana, brought suit in ejectment to recover possession of a certain lot, with the church building and manse situate thereon, and damages for the unlawful detention thereof. Appellees answered by general denial. The cause was sent, on application for a change of venue, to the Superior Court of Vanderburgh County, where a trial resulted in a finding and judgment in favor of appellees.

The overruling of appellant's motion for a new trial is the only alleged error. The grounds of the motion for a new trial are that the decision of the court is not sustained by sufficient evidence and is contrary to law.

The lot in question was conveyed in 1854, by general warranty deed, to certain named persons, "trustees of the Washington congregation of the Cumberland Presbyterian Church, in Daviess county, Indiana," for a stated consideration of $85.

This controversy grew out of the union or merger, in 1906, of the Cumberland Presbyterian Church with the Presbyterian Church in the United States of America; and the question for settlement is, Who is the legal successor of the original grantee named in this deed? Appellees favored union of these churches, concurred in the action of the general assemblies declaring such union accomplished, and hence represent the united church, and as such representatives claim title to the property. Appellants deny the authority of the general assembly of the Cumberland Presbyterian Church to effect a merger or union with another church, dispute the validity of the action taken, refuse to acquiesce therein, and, retaining the original name, claim to be the true Washington congregation of the Cumberland Presbyterian Church and the rightful and legal owner of the property in dispute. The civil courts have jurisdiction over the subject-matter of the title to property, and their

1. judgment has been invoked by the parties; hence we are required, though reluctant to do so, to enter upon

the consideration of a controversy which inevitably involves the domain of ecclesiastical jurisprudence. The paramount question submitted is the validity or binding force of the union of the Cumberland Presbyterian Church, which, for brevity, we shall style the Cumberland Church, and the Presbyterian Church in the United States of America, which we shall designate as the Presbyterian Church, as respects both the parties to this action and the civil courts. Under our view of the law governing such cases as this, it will not be necessary to set out the declared doctrines and polity of these churches at very great length.

The distinctive name, presbyterianism, indicates primarily a system of church government embodying the belief that the management of the new testament church is in 2. the hands of representatives of the people called presbyters. Presbyterianism, as it exists, is both a polity and a doctrine. Its doctrine is commonly known as Calvinism; and its polity consists of self-government through chosen respresentatives, rejecting alike the rule of one man and the rule of the extemporized and irresponsible assembly. All branches of the Presbyterian Church are founded essentially on the Westminster standards, which consist of six books: Confession of Faith, Larger Catechism, Shorter Catechism, Form of Government, Directory of Worship and Book of Discipline. The first three books are doctrinal, and the last three relate to government and worship. The Presbyterian Church, represented by appellees, adhered to the Westminster confession of faith, which, among other things, declared that

"God from all eternity did by the most wise and holy counsel of His own will, freely and unchangeably ordain whatsoever comes to pass. * * * By the decree of God, for the manifestation of His glory, some men and angels are predestinated unto everlasting life, and others foreordained to everlasting death. These angels and men, thus predestinated and foreordained, are particularly and unchangeably designed; and their number

is so certain and definite that it cannot be either increased or diminished. * * * Neither are any other redeemed by Christ, effectually called, justified, adopted, sanctified and saved but the elect only. The rest of mankind, God was pleased * * * to pass by and to ordain them to dishonor and wrath for their sin, to the praise of His glorious justice. * * * Elect infants, dying in infancy, are regenerated and saved by Christ through the spirit, who worketh when, and where and how He pleaseth. So also are all other elect persons, who are incapable of being outwardly called by the ministry of the word.''

The governing body in each presbyterian congregation is the church session, consisting of the pastor, when there is one, and one or more elders. A presbytery consists of all the ministers, in number not less than five, and one ruling elder from each congregation, within a certain district. A synod embraces at least three presbyteries, and consists of ministers and ruling elders from the local churches. The general assembly is the highest authority in the church, and is a representative body composed of ministers and ruling elders selected by each of the presbyteries. A controversy arising in any of these bodies may be carried by appeal to the higher judicatories successively, until the general assembly is reached, whose decision is final. Each member joining the church agrees to abide by the church laws, rules and regulations.

The first Presbyterian Church on this continent was formed about the middle of the seventeenth century, and in 1785 the synods of New York and Philadelphia took steps for the union of all the presbyterian bodies, which culminated in the formation and meeting of the first general assembly, May 21, 1789.

The first constituent body of the Cumberland Church, as an independent organization, was a presbytery formed by three presbyterian ministers on February 4, 1810, in Dickson county, Tennessee. This action was the outgrowth of a re-

vival and spiritual awakening which swept over the western wilderness in 1800 and succeeding years. This movement offended the Presbyterian Church, for four reasons: (1) The joyous emotions and demonstrations of converts were looked upon as fanatical and not consistent with soberness and good order; (2) the mourner's bench, campmeeting, and other measures adopted to promote the revival, were condemned as unscriptural, and the lowering of educational standards, in licensing men as exhorters and evangelists to meet the demand for ministers, was regarded as un-presbyterian; (3) the pleading of revivalists with sinners to accept salvation, freely offered to all, seemed a denial of the certainty and definiteness of the eternal decrees taught by the Westminster confession of faith, and (4) the men licensed as evangelists were ordained by the revival ministers, with permission to adopt the confession of faith, except "the idea of fatality," as it seemed to be taught in that book. This constituted the irreconcilable offense. The Cumberland Church entertained a lingering hope of reconciliation and reunion with the mother church, until the growth of the church necessitated the formation of the Cumberland synod in 1813, which was the act of final separation. In 1814 the general assembly of the Presbyterian Church recognized the division as final, and thereafter dealt with the Cumberland Church as a sister evangelical denomination.

The distinctive belief of the Cumberland Church on doctrinal points of dissent from the Westminster confession is concisely stated as follows:

"(1) That there are no eternal reprobates; (2) that Christ did not die for part only, but for all mankind; (3) that all infants dying in infancy are saved through Christ and the sanctification of the spirit; (4) that the operations of the Holy Spirit are coextensive with the atonement—that is, on the whole world in such a manner as to leave it without excuse."

The polity and governmental methods of the two churches are conceded to be substantially alike.

In 1829 a general assembly of the Cumberland Church was formed and convened, and in 1883 the general assembly adopted a constitution for that church, which was duly ratified and approved by the presbyteries. The following provisions of this constitution are deemed relevant:

"(40) The general assembly is the highest court of this church, and represents in one body all the particular churches thereof. It bears the title of the General Assembly of the Cumberland Presbyterian Church, and constitutes the bond of union, peace, correspondence and mutual confidence among all its churches and the courts. * * * It shall meet as often as once every two years * * * and shall consist of commissioners from the presbyteries. * * * (43) The general assembly shall have the power to receive and decide all appeals, references and complaints regularly brought before it from the inferior courts; to bear testimony against error in doctrine and immorality in practice, injuriously affecting the church; to decide in all controversies respecting doctrine and discipline. * * * To receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church. * * * (60) Upon the recommendation of the general assembly, at a stated meeting, by a two-thirds vote of the members thereof, the confession of faith, catechism, constitution, the rules of discipline, may be amended or changed when a majority of the presbyteries, upon the same being transmitted for their action, shall approve thereof."

"CONFESSION OF FAITH, SECTION III. It is the prerogative of these courts, ministerially, to determine controversies of faith and questions of morals, to set down rules and directions for the better ordering of the public worship of God and government of His church, * * * and authoritatively to determine the same, which determinations are to be received with reverence and submission."

In 1860 the general assembly of the Cumberland Church passed a resolution declaring the hope that the entire presbyterian family might soon be represented in one general assembly; and in 1867 appointed a committee to take preliminary action looking to organic union with the Presbyterian Church. The Cumberland Church, through its com-

mittee, proposed at that time to surrender its name, standards of ministerial education and points of difference in form of government, discipline and directory. This attempt at union failed. Propositions for union with the Evangelical Lutheran Church, and the Methodist Protestant Church were under consideration by the general assemblies of 1882-1887. The Cumberland general assembly in 1903 appointed a committee on fraternity and union to confer with like committees from other presbyterian bodies, looking to organic union among presbyterian churches in the United States.

The general assembly of the Presbyterian Church in 1903, disavowing the extreme fatalistic inferences drawn from statements in the confession of faith, and insisting that ordination vows required its reception and adoption only as containing the system of doctrine taught in the Holy Scriptures, made the following authoritative and explicit declaration:

"(1)   With reference to chapter III of the confession of faith: That concerning those who are saved in Christ, the doctrine of God's eternal decree is held in harmony with the doctrine of His love to all mankind, His gift of His Son to be the propitiation for the sins of the whole world, and His readiness to bestow His saving grace on all who seek it. That concerning those who perish, the doctrine of God's eternal decree is held in harmony with the doctrine that God desires not the death of any sinner, but has provided in Christ a salvation sufficient for all, adapted to all, and freely offered in the gospel to all; that men are fully responsible for their treatment of God's gracious offer; that His decree hinders no man from accepting that offer; and that no man is condemned except on the ground of his sin. (2) With reference to chapter X, section 3, of the confession of faith, that it is not to be regarded as teaching that any who die in infancy are lost. We believe that all dying in infancy are included in the election of grace, and are regenerated and saved by Christ through the spirit, who works when and where and how He pleases."

The committee on fraternity and union of the Cumberland Church met with the committee on church coöperation and union of the Presbyterian Church, and formulated and agreed upon a joint report to be submitted to the general assemblies of the two churches, which report embraced (1) Plan of reunion and union of the two churches. (2) Concurrent declarations to be adopted by the respective general assemblies meeting in 1904. (3) Recommendations.

In this report the commitee said:

"We believe that the union of christian churches of substantially similar faith and polity would be to the glory of God, the good of mankind and the strengthening of Christian testimony at home and abroad."

And among the concurrent declarations to be adopted was the following:

"In adopting the confession of faith of the Presbyterian Church in the United States of America, as revised in 1903, as a basis of union, it is mutually recognized that such agreement now exists between the systems of doctrine contained in the confessions of faith of the two churches as to warrant this union—a union honoring alike to both."

The plan of union provided that the two churches be united as one, under the name and style of "The Presbyterian Church in the United States of America," and on the doctrinal basis of the confession of faith of the Presbyterian Church as revised in 1903, and its other doctrinal and ecclesiastical standards; and the acknowledgment of the scriptures of the Old and New Testaments as the inspired word of God, the only infallible rule of faith and practice. It further provided:

"(3) Each of the assemblies shall submit the foregoing basis of union to its presbyteries, which shall be required to meet on or before April 30, 1905, to express their approval or disapproval of the same by a categorical answer to this question: 'Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presby-

terian Church on the following basis: The union shall
be effected on the doctrinal basis of the confession of
faith of the Presbyterian Church in the United States
of America, as revised in 1903, and of its other doc-
trinal and eccelesiastical standards; and the scriptures
of the Old and New Testaments shall be acknowledged
as the inspired word of God, the only infallible rule of
faith and practice?' Each presbytery shall, before the
10th day of May, 1905, forward to the stated clerk of
the assembly with which it is connected a statement of
its vote on said basis of union.   (4) The report of the
vote of the presbyteries shall be submitted by the re-
spective stated clerks to the general assemblies meet-
ing in 1905, and if the general assemblies shall then
find and declare that the foregoing basis of union has
been approved by the constitutional majority of the
presbyteries connected with each branch of the church,
then the same shall be of binding force, and both as-
semblies shall take action accordingly.''

The joint report was adopted by the general assembly of
the Cumberland Church in 1904 by an affirmative vote of
162, and a negative vote of 74, and the basis of union referred
to the presbyteries for their approval or disapproval.

The Cumberland Church contained 114 presbyteries, and
its general assembly in 1905 found that 60 had voted for
approval of the reunion and union of the two churches, 51
for disapproval, 1 for approval conditionally, and 2 had
not voted. It was thereupon declared that a constitutional
majority of the presbyteries had voted approval of the re-
union and union on the basis set forth in the joint report,
and that such reunion and union had been constitutionally
agreed to by the Cumberland Church and the basis of union
constitutionally adopted. A minority protest was filed to
the union movement. The joint committee during the next
succeeding year arranged the details of union, and agreed
upon a joint report to both general assemblies, including
therein appropriate resolutions, whereby the reunion and
union was declared constitutionally and finally consum-
mated. The final report of the committee on fraternity and
union of the Cumberland Church, including therein such

joint report, was adopted by the general assembly convened at Decatur, Illinois, by an affirmative vote of 165 and a negative vote of 91. The moderator, in pursuance of the directions and requirements of said joint report, thereupon made the following announcement:

"The joint report of the two committees on reunion and union and the recitals and resolutions therein contained and recommended for adoption, having been adopted by the general assembly of the Presbyterian Church of the United States of America and the general assembly of the Cumberland Presbyterian Church, and official notice of such adoption having been received by each of said general assemblies from the other, I do solemnly declare and here publicly announce that the basis of reunion and union is now in full force and effect, and that the Cumberland Presbyterian Church is now reunited with the Presbyterian Church in the United States of America as one church, and that the official records of the two churches during the period of separation shall be preserved and held as making up the history of the one church."

It having been provided in said joint report that after the announcement of the foregoing declaration no further business in the general assembly of the Cumberland Church should be in order except a motion to adjourn *sine die,* as a separate assembly, the following adjourning order was adopted:

"Resolved, that this general assembly do now adjourn *sine die,* as a separate general assembly, to meet in and as part of the One Hundred and Nineteenth General Assembly of the Presbyterian Church in the United States of America, on the third Thursday of May, 1907, at 11 o'clock a.m., at the place chosen by the One Hundred and Eighteenth General Assembly of the Presbyterian Church in the United States of America. Thereupon the moderator declared said general assembly adjourned in accordance with the adjourning order."

Immediately after adjournment the dissenting minority reassembled in the Grand Army hall near by, chose a temporary chairman and clerk, passed a resolution declaring said

action rescinded, and adjourned to meet at a designated time and place the following year. This organization has been maintained since, and claims to be the true Cumberland Presbyterian Church, and entitled to all the property, rights and privileges owned and held by the church of that name prior to the declared reunion and union with the Presbyterian Church.

Appellants' contentions, in substance, are, that the powers of the general assembly and presbyteries of the Cumberland church are limited by its constitution; that no express authority to form a union with another church is conferred, and that the attempted union and merger is accordingly *ultra vires* and void; that if power to make the union existed, it was exercised so irregularly as to make the result void; that the title to the property in question is impressed with a special and limited trust which precludes its transfer to and use by any denomination other than the Cumberland Church.

In the case of *Watson* v. *Jones* (1871), 13 Wall. 679, 722, 20 L. Ed. 666, controversies involving the title to property held by religious societies were classified as follows: ''(1) The first of these is when the property which is the subject of controversy has been, by the deed or will of the donor, or other instrument by which the property is held, by the express terms of the instrument devoted to the teaching, support, or spread of some specific form of religious doctrine or belief. (2) The second is when the property is held by a religious congregation which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority. (3) The third is where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme

judicatory over the whole membership of that general organization.''

We shall subsequently consider whether the terms of the deed to the property in dispute create such a special trust as to bring this case within the first of these classes. It is manifest that this controversy is not of the second class. The controlling question at issue falls clearly within the third of these classifications, and the declarations of law made in the case of *Watson* v. *Jones, supra,* and followed with constancy by this court, and generally by other American courts, aptly apply to and conclusively determine the matter in dispute. The case cited involved the conflicting claims of two factions of the Presbyterian Church to church property, and we quote with approval from the opinion of Mr. Justice Miller the following paragraphs: ''There are in the Presbyterian system of ecclesiastical government, in regular succession, the presbytery over the session of the local church, the synod over the presbytery, and the general assembly over all. These are called, in the language of the church organs, 'judicatories,' and they entertain appeals from the decisions of those below, and prescribe corrective measures in other cases. In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them. * * * It may very well be conceded that if the 'general assembly of the Presbyterian Church' should undertake to try one of its members for murder, and punish him with death or imprisonment, its sentence would be of no validity in a civil court or anywhere else. * * * But it is a very

different thing where a subject-matter of dispute, strictly
and purely ecclesiastical in its character—a matter over
which the civil courts exercise no jurisdiction—a matter
which concerns theological controversy, church discipline, ec-
clesiastical government, or the conformity of the members
of the church to the standard of morals required of them—
becomes the subject of its action. It may be said here, also,
that no jurisdiction has been conferred on the tribunal to
try the particular case before it, or that, in its judgment, it
exceeds the powers conferred upon it, or that the laws of the
church do not authorize the particular form of proceeding
adopted; and, in a sense often used in the courts, all of those
may be said to be questions of jurisdiction. But it is easy
to see that if the civil courts are to inquire into all these mat-
ters, the whole subject of the doctrinal theology, the usages
and customs, the written laws, and fundamental organiza-
tion of every religious denomination may, and must, be ex-
amined into with minuteness and care, for they would be-
come, in almost every case, the *criteria* by which the validity
of the ecclesiastical decree would be determined in the civil
court. This principle would deprive these bodies of the right
of construing their own church laws, would open the way to
all the evils which we have depicted as attendant upon the
doctrine of Lord Eldon, and would, in effect, transfer to
the civil courts where property rights were concerned the
decision of all ecclesiastical questions.''

The recital of portions of the constitution of the Cumber-
land Church and the proceedings of its general assembly in
this opinion was not for the purpose of reviewing the
4.     facts and determining for ourselves the correctness
of the conclusion reached, but chiefly to show that the
question considered and decided was wholly ecclesiastical,
that the proceedings were fairly regular and not founded
upon a naked usurpation of authority. If church judicatories
proceed palpably without jurisdiction, and their action is
clearly *ultra vires,* neither the church membership nor the

civil courts should respect their decisions; but when the matter in controversy is purely of ecclesiastical cognizance, and the church tribunal proceeds in manifest good faith under color of authority, its decision upon the question of its own jurisdiction, as well as upon subsidiary questions, is binding upon the civil courts.

In the case of *Lamb* v. *Cain* (1891), 129 Ind. 486, 518, 14 L. R. A. 518, this court speaking to the point under consideration said: "It will scarcely be denied that the general conference, which is the highest legislative and judicial body in the church, has power to determine what is the constitution under which it acts, and to determine what is the confession of faith of the church which it represents. The question as to whether the old confession of faith and the old constitution had been superseded by the new was a question that squarely confronted the conference of 1889. Assuming that the action of commission on revision, coupled with the action of the conference of 1885, and vote upon the subject of revision and amendment, gave it jurisdiction in the premises, the general conference of 1889 adjudged and declared that which appears in the record before us as the revised confession of faith and amended constitution, was in fact the fundamental belief and constitution of the Church of the United Brethren in Christ in the United States. Who shall question the correctness of its decision or revise it? The civil courts? To do so would be to assume ecclesiastical jurisdiction, a jurisdiction they do not possess. It was clearly an ecclesiastical matter, pertaining to the government of the church, and the church, through its legally constituted tribunal, having adjudicated the matter, we think the civil courts are bound by such adjudication."

In the case of *White Lick Quarterly Meeting, etc.*, v. *White Lick Quarterly Meeting, etc.* (1883), 89 Ind. 136, 151, this court said: "Civil courts in this country have no ecclesiastical jurisdiction. They cannot revise or question ordinary acts of church discipline, and can only interfere in church

controversies where civil rights or the rights of property are involved. Where a civil right depends upon some matter pertaining to ecclesiastical affairs, the civil tribunal tries the civil right, and nothing more, taking the ecclesiastical decisions, out of which the civil right has arisen, as it finds them, and accepting those decisions as matters adjudicated by another jurisdiction. The civil courts act upon the theory that the ecclesiastical courts are the best judges of merely ecclesiastical questions, and of all matters which concern the doctrines and discipline of the respective religious denominations to which they belong. When a person becomes a member of a church he becomes so upon the condition of submission to its ecclesiastical jurisdiction, and however much he may be dissatisfied with the exercise of that jurisdiction, he has no right to invoke the supervisory power of a civil court so long as none of his civil rights are invaded.'' See, also, *Gaff* v. *Greer* (1882), 88 Ind. 122, 45 Am. Rep. 449; *O'Donovan* v. *Chatard* (1884), 97 Ind. 421, 49 Am. Rep. 462; *Dwenger* v. *Geary* (1888), 113 Ind. 106; *Smith* v. *Pedigo* (1896), 145 Ind. 361, 19 L. R. A. 433; *State, ex rel.,* v. *Cummins* (1908), 171 Ind. 112.

Appellants have cited the cases of *Smith* v. *Pedigo, supra,* and *Hatfield* v. *DeLong* (1901), 156 Ind. 207, 51 L. R. A. 751, as sustaining their contention that civil courts 5. will examine and construe for themselves ecclesiastical constitutions, rules and usages when necessary in the determination of property or civil rights. The first of these cases involved a dispute between two factions of a Baptist Church, which was of the congregational type, strictly independent of other ecclesiastical associations, and, so far as church doctrine or government was concerned, owing no fealty or obligation to any higher authority. The case, therefore, came within that class where there is no authorized ecclesiastical judicatory to decide the matter of difference, and it was alleged that property dedicated and held for a particular use was being diverted by the teaching of a doctrine

different from that contemplated at the time the donation or dedication was made, in which case the court, however delicate and difficult the task might be, will inquire whether the party accused of violating the trust is teaching a doctrine so far at variance with that originally intended as to defeat the objects of the trust, and if the charge is found true will make such order in the premises as to secure a faithful execution of the trust confided. See, also, *Mount Zion Baptist Church* v. *Whitmore* (1891), 83 Iowa 138, 49 N. W. 81, 13 L. R. A. 198; *Christian Church, etc.,* v. *Church of Christ, etc.* (1906), 219 Ill. 503, 76 N. E. 703; *Hale* v. *Everett* (1868), 53 N. H. 9, 16 Am. Rep. 82; *Schnorr's Appeal* (1870), 67 Pa. St. 138, 5 Am. Rep. 415; *Appeal of Ramsey* (1870), 88 Pa. St. 60; *Cape* v. *Plymouth Congregational Church* (1903), 117 Wis. 150, 93 N. W. 449.

Certain declarations in the case of *Hatfield* v. *DeLong, supra,* are not in accord with American authorities and must be disapproved. If, as in that case, the subject-matter involved is wholly of ecclesiastical cognizance, civil 6. courts are without jurisdiction to act at all, or to grant any relief, legal or equitable. The right to worship according to the dictates of conscience is guaranteed to the citizens of this republic, but controversies growing out of differing doctrinal beliefs and spiritual conceptions, and involving no civil right, are too intangible to form the basis of a civil action. It is the exclusive prerogative of religious tribunals, when considering only ecclesiastical interests and questions, to construe their own statutes and ordinances, and to determine for themselves the regularity and validity of their proceedings. It cannot concern the civil authorities whether one accused of a spiritual offense be tried by an unconstitutional tribunal, or be denied merely religious rights and privileges without trial or without cause, since membership in an unincorporated religious society does not constitute a civil or valuable right within the meaning of the law. *Fussell* v. *Hail* (1908), 233 Ill. 73, 84 N. E. 42; *Shannon* v.

*Frost* (1842), 3 B. Mon. 253; *Nance* v. *Busby* (1892), 91 Tenn. 303, 18 S. W. 874, 15 L. R. A. 801.

It is not accurate nor correct to say that an association for religious worship is like an ordinary fraternal or beneficial society or social club, and its membership and affairs

7. are to be determined by the same legal principles, since the one is founded upon a distinctive conception of the relation and duty of man to his Maker, and the other is concerned only with the relation of man to his fellows. In so far as the case of *Hatfield* v. *DeLong, supra,* holds that in a matter concerning only spiritual or ecclesiastical rights a civil court has jurisdiction to examine into the regularity and validity of a church tribunal and restrain its proceedings for nonconformity to its own laws, it is expressly overruled. *Fussell* v. *Hail, supra.*

We have seen that the general assembly of the Cumberland church, by section forty-three of its constitution, had specific authority to decide all controversies respect-

8. ing doctrine and discipline, and that it did explicitly decide that the confession of faith of the Presbyterian church, as revised in 1903, was in substantial accord with its own doctrinal tenets, and that decision under our own holdings and other authorities is accordingly binding and conclusive not only upon the membership of the church but also upon the civil courts. *Ferraria* v. *Vasconcelles* (1860), 23 Ill. 403; *Chase* v. *Cheney* (1871), 58 Ill. 509, 11 Am. Rep. 95; *Schweiker* v. *Husser* (1893), 146 Ill. 399, 34 N. E. 1022; *Brundage* v. *Deardorf* (1899), 92 Fed. 214, 34 C. C. A. 304; *Watson* v. *Avery* (1867), 65 Ky. 332; *Trustees, etc.,* v. *Harris* (1900), 73 Conn. 216, 47 Atl. 116, 50 L. R. A. 636; *Trustees, etc.,* v. *Halvorson* (1890), 42 Minn. 503, 44 N. W. 663.

This record does not present the case of a factional division of a congregation, or schism in the body of a church, on account of conflicting beliefs or doctrinal innova-

9. tions, but that of a minority dissenting from the official judgment of the highest church judicatory, in

which action, though protesting, they yet participated. It follows that unless the offending act was clearly unconstitutional and *ultra vires,* appellants and those allied with them were bound, and by their insubordination have become seceders, with no right to share in the property and temporalities of the church of which they were formerly a part.

This question might be judicially determined with brevity, but the sacred interests involved, and the earnest and conscientious purposes of the litigants invite and make appropriate some elaboration of argument. It is insisted that the momentous issue of the surrender of its distinctive name and separate identity, and the union and merger with a greater kindred organization, should have been submitted to and passed upon directly by the whole membership of the Cumberland Church, and that the sovereignty of that church is in its individual membership and not in its governing bodies.

The primary object of religious association is worship, to which the possession of property is subordinate and necessarily incident. No man can hope to receive pecuniary profit from his religious membership, and as a communicant in a church he has no private interest in its property. The action now under consideration was purely ecclesiastical and its effect upon church property was resultant and consequential. This statement is made merely to emphasize the fact that no personal or pecuniary rights are involved in this controversy necessitating an opportunity to individuals to be heard or to participate in the proceedings of which complaint is made. But we have already seen that the presbyterian system of government is not that of a pure democracy, but is republican in character and wholly representative. John Calvin, who formulated the presbyterian system of doctrine and polity, was familiar with the governmental principles of the Genevese republic. A notable resemblance has been remarked in the governmental systems of the Presbyterian Church and of this great republic of ours. An amendment to the Consti-

tution of the United States must first pass both houses of congress and be ratified by the legislatures of two-thirds of the states. The constitution of the Presbyterian Church may be amended by a two-thirds vote of its general assembly and the approval of a majority of the presbyteries, but in neither case does the individual member of the society directly participate. It is a suggestive historical incident, that while the first general assembly of the Presbyterian Church was convened in Philadelphia in May, 1789, at the same time, and only four blocks distant, the convention was in session framing the federal Constitution, with the dominant purpose of conferring upon the national government supreme executive, legislative and judicial powers in national affairs. Many of the leaders of the constitutional convention were familiar with presbyterianism, and it is said, on trustworthy authority, that Alexander Hamilton kept the Presbyterian form of government on his study table during the session of the convention. No express authority is found in the federal Constitution for the expansion of our domain by the annexation of foreign territory and peoples, but this power is an inherent attribute of sovereignty, and is validly exercised by the national authorities without reference to the states or citizens for approval.

It is contended that the jurisdiction of the general assembly is expressly limited by section twenty-five of the Constitution of the Cumberland Church. This section prescribes the jurisdiction of the church session, the presbytery, the synod and the general assembly, and concludes with the statement that

"the jurisdiction of these courts is limited by the express provisions of the constitution."

This provision was designed to fix definite limits to the jurisdiction of these judicatories as between themselves, but not to circumscribe the sovereign power of the church itself, or of the body in which its supreme power was vested.

This church from its inception entertained the belief that it had inherent or implied power to unite with another church of similar doctrine and order, and, as shown 14. in the introductory statement of facts, often expressed the hope of reunion with the mother church, and made frequent overtures and efforts towards union with other denominations. It possessed, undoubtedly, all the sovereign powers of the parent church from which it sprang, and of other kindred presbyterian branches. The general assembly of the Presbyterian Church in 1801 made efforts to unite with the Reformed Dutch Church, the Associated Reformed Churches and the General Assembly of Connecticut. It divided into the Old School and the New School in 1838, and reunited in 1870. The Associated Reformed Church and the Associate Church united in 1858, forming the United Presbyterian Church. The Independent Presbyterian Church of the Carolinas united with the general assembly of the Presbyterian Church (South) in 1863, and the Alabama presbyteries of the Associate Reform Church united with the Presbyterian Church (South) in 1867. The union 15. principle finds scriptural sanction, and had for its advocate the author of Calvinism himself, who devoted the last days of his life to the interests of church unity. He prayed and labored for the union of reformed churches, wrote letters, pamphlets and books urging this upon all the friends of evangelical religion, and earnestly longed to see these churches closing their ranks and presenting an undivided front in the promulgation of their common doctrines.

In the light of these historical facts, it cannot be plausibly denied, and is not disputed, that the Cumberland Church had power to enter into a union with the 13. Presbyterian Church, but the specific claim is that its general assembly, with the concurrence of the presbyteries, had no authority, without a vote of the membership, to consummate such union. The church unions heretofore

enumerated were effected in a manner substantially the same as that adopted in the instance before us. There is no such thing in the presbyterian polity as a popular vote, but upon the general assembly is conferred supreme legislative, administrative and judicial authority in church affairs, and it constitutes the "bond of union," and "represents in one body all the particular churches." It is charged with oversight of matters affecting the church as an entirety, and upon ·it is enjoined the duty of concerting "measures for promoting the prosperity and enlargement of the church," and it is expressly authorized "to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of this church." The fundamental purpose of this church was to evangelize and christianize the whole world, and if, in the promotion of that end, its general assembly might lawfully take under its jurisdiction ecclesiastical bodies inferior in numbers and influence, it might, by the same right and with more propriety, consolidate its forces with a church of greater numbers, power and resources, of like doctrine and polity. All of its members earnestly desirous of the speedy attainment of the ultimate aim must unhesitatingly applaud the acquisition of means augmenting the power and influence of the common church, provided no surrender of conscientious convictions touching their faith and practice is required. It is conceded that the general assembly of the Cumberland Church had power to amend the confession of faith and the constitution of that church so as to make them conform in every particular to the confession of faith and polity of the Presbyterian Church, by the precise method and vote pursued for the union of the two churches. This was the effect of the vote for consolidation, and hence the mere act of effecting a union involved a question of policy and expediency rather than of power or authority. It is our conclusion that the Cumberland Church had inherent power to unite with another ecclesiastical body whose doctrine and polity

were deemed in harmony with its own, and that the authority to consummate such union was vested in its general assembly, without the direct sanction of its lay membership; that that body did not usurp authority or transcend its powers, and, so far as this court has jurisdiction to pass upon that question, the reunion and union of that church with the Presbyterian Church, as declared by the general assembly at Decatur, Illinois, was legal and valid, and binding alike upon its membership and upon the civil courts.

The case of *Smith* v. *Swormstedt* (1853), 16 How. 288, 14 L. Ed. 942, involved the validity of a division of the Methodist Episcopal Church, by its general conference, and the court held that body had inherent power to make the division, saying in part: "It is insisted, however, that the general conference of 1844 possessed no power to divide the Methodist Episcopal Church as then organized, or to consent to such division. * * * But we do not agree that this division was made without the proper authority. On the contrary, we entertain no doubt but that the general conference of 1844 was competent to make it; and that each division of the church, under the separate organization, is just as legitimate, and can claim as high a sanction, ecclesiastical and temporal, as the Methodist Episcopal Church first founded in the United States. The same authority which founded that church in 1784 has divided it, and established two separate and independent organizations occupying the place of the old one. * * * It cannot therefore be denied, indeed, it has scarcely been denied that this body, while composed of all the traveling preachers, possessed the power to divide it and authorize the organization and establishment of the two separate independent churches. The power must necessarily be regarded as inherent in the general conference. As they might have constructed two ecclesiastical organizations over the territory of the United States originally, if deemed expedient, in the place of one, so they might, at any subsequent period, the power remaining unchanged." See,

also, *Gibson* v. *Armstrong* (1847), 7 B. Mon. 481; *McGinnis* v. *Watson* (1861), 41 Pa. St. 9.

The precise questions presented by this appeal have recently been passed upon by the courts of other states. In the case of *Mack* v. *Kime* (1907), 129 Ga. 24, 58 S. E. 184, the supreme court of Georgia announced its conclusion as follows: "The general assembly, as the highest church court, has determined the questions arising as to the alleged differences of doctrine. The general assembly, as the highest authority of the church, executive, legislative and judicial, has determined that it is wise and best that the reunion should take place, and the constitution of the church, as we have interpreted it, gives that body power and jurisdiction to deal with this question, and the question of reunion has been settled in form and manner as the constitution prescribes." In the case of *Brown* v. *Clark* (1909), 102 Tex. 323, 116 S. W. 360, the supreme court of Texas said: "We conclude that the general assembly of the Cumberland Church was the embodiment and expression of the sovereign power of the whole church and its membership, and that it could do for the churches and for the membership whatever they could have done if they had been assembled for that purpose. The general assembly of the Cumberland Church had authority to determine, from the provisions of the constitution, whether it had the power to enter into the union with the Presbyterian Church, and having decided that it had such authority and having acted upon that decision the civil courts have no power to review that action." A like conclusion was reached in each of the following cases: *Fussell* v. *Hail* (1907), 134 Ill. App. 620; *Wallace* v. *Hughes* (1909), 115 S. W. (Ky.) 691; *Permanent Committee, etc.*, v. *Pacific Synod, etc.*, (1909), 157 Cal. 105, 106 Pac. 395.

A contrary holding was made in *Landrith* v. *Hudgins* (1908), 121 Tenn. 556, 120 S. W. 783, and *Boyles* v. *Roberts* (1909), 222 Mo. 613, 121 S. W. 805.

The case of *Landrith* v. *Hudgins, supra,* affirms that the

sovereign power of the Cumberland Church is in its general assembly and presbyteries, which, acting together, had power to effect a union with another church of like doctrine and order, without a vote of the separate congregations. This proposition is forcibly stated in the following paragraph on page 592: "The general assembly, then, is made up of representatives of the people—that is, elders; and representatives of the church at large—that is, ministers. Thus it is composed of all governing agencies. The sovereignty of the organization, however, does not reside in that body alone, or in the presbyteries, but in it and the presbyteries. Each acting alone is limited to powers expressly given (Const., Sec. 25). When they act together, the whole governing body acts—the church at large, and the people themselves in and through their elders who are the representatives of each several church. The power which makes or amends the constitution, or constituent contract of the organization, is the power where sovereignty is lodged. This power is that of the general assembly and the presbyteries acting together. This was shown by the manner in which the constitution of the Cumberland Presbyterian Church was adopted in 1883. In the case referred to, the people did not vote. The power that can constitute can dissolve, or can carry the organization into the body of another organization. Persons who become members of a church with this form of organization agree by so doing to abide the powers vested in the organization."

That court, however, holds, that civil tribunals, when called upon to determine property rights dependent upon the validity of such union or action, will examine ecclesiastical constitutions and church usages, and determine for themselves, whether the proper procedure has been adopted and followed; and proceeding upon this principle finds that the doctrines of the two churches were not substantially identical, and were not brought into accord in a constitutional way, and that a material part of the plan of union was not submitted to the approval of the presbyteries.

The case of *Boyles* v. *Roberts, supra,* followed that of *Landrith* v. *Hudgins, supra.* Both of these cases strongly rely upon the case of *General Assembly, etc.,* v. *Lord Overtoun,* [1904] A. C. 515. The constitutional separation of church and state in this country should make the English case, if similar upon its facts, of little persuasive force as an authority in an American court.

The conclusion reached and announced, as to the jurisdiction and authority of the general assembly, disposes of all subsidiary questions raised in argument. Appellants' counsel contended that the general assembly of the Cumberland Church was not vested with implied power to merge that church into another body and thereby terminate its existence and effect its death. The assumption that a union, consolidation, merger, or whatever it is pleasing to term the action in question, is the equivalent of death, and the cessation of the organic functions of the church is fallacious. Every congregation, presbytery and synod of the church, with possibly some changes of constituent membership and geographical boundaries, will continue its existence and accustomed work without interruption; the manifest purpose of the union being not death and disintegration, but a larger life, and, in the opinion of the governing body, a greater opportunity in carrying forward the commands of the Master and Head of the church.

Objection is made to the validity of the union, because of the failure to submit to the presbyteries the agreement that by the merger the Cumberland name was surrendered and the name of the Presbyterian Church adopted for the consolidated body. If it be conceded, as it is by all the civil courts which have considered the question, that the general assembly and presbyteries had jurisdiction over the subject of making a union with another church, then as the supreme executive, legislative and judicial authority in the church, under our view of the law, the general assembly had power to decide on the proper mode of procedure, and to

determine conclusively the regularity and validity of the proceedings had to effect the desired object. It is manifest, however, that the fundamental and paramount point of disagreement between these two churches had been with regard to their faith and doctrine, and the vital question for decision was, Shall the reunion and union be made on the basis of the revised confession of faith and other standards of the Presbyterian Church. The surrender of the name distinctive of the Cumberland Church, apart from sentimental considerations, was of little consequence. The inherent power conceded to the general assembly, and the express assent of the presbyteries to the proposed union on the doctrinal basis approved, authorized the formal completion of the union, implied some modification of names, and, it seems to us under any view of the law, empowered the general assemblies to adopt any name deemed by them most appropriate for the consolidated church.

It is finally contended, that, by the terms of the conveyance made in 1854 to the trustees of the Cumberland Church, a special and limited trust was created in this property, 19. which precludes its diversion to the use of the united church. This deed is a civil contract, and it is the prerogative of the civil courts to construe its terms and to determine its meaning and legal effect. In a suit for forfeiture of title by the donor or grantor of property, on the ground of the breach of a special trust expressed in the deed, a civil court may be and often is required to deal with ecclesiastical questions, since church judicatories have no jurisdiction to decide such matters. But we have no such case before 20. us. This property appears to have been purchased, in the ordinary way of business, for $85, and conveyed to the trustees by a general warranty deed, without condition or limitation. It is entirely clear that no trust, express or implied, is attached to the title. Appellants at no time had any interest in the property except as members of a congregation which was an integral part of the ecclesiastical so-

ciety known as the Cumberland Presbyterian Church. Our only duty is to determine the identity of the ecclesiastical successor of the original grantee. This we have seen has been determined for us, since the union of the Cumberland Church with the Presbyterian Church carried into the united body all of its property. The validity of that union appellants cannot question, and in it they must acquiesce, or defy the authority and decrees of the church to which they pledged allegiance. Consciences cannot be bound, and if in the assertion of individual opinion and conscientious dictates appellants segregate themselves from the body of the church, they must depart as they came in, empty handed. The court did not err in overruling appellants' motion for a new trial.

The judgment is affirmed.

## ON PETITION FOR REHEARING.

MONTGOMERY, J.—It is charged in appellant's petition for a rehearing that this court abdicated its functions in accepting the decision of the general assembly of the Cumberland Church as conclusive upon the matter in controversy. The original opinion plainly declares that there are no provisions in the deed conveying to the church the particular property involved, creating a special or limited trust, or requiring construction. This being true, both parties agree that the only remaining question is the validity of the union or merger of the two churches. This is purely an ecclesiastical question, over which civil courts have no jurisdiction. The circumstance, that control over certain real or personal property devoted to church uses will pass as an incident of the contested matter, does not change the nature of the controversy, nor operate to clothe civil courts with power to decide the real issue, if a church judicatory has been provided for the settlement of such disputes. In the instance under consideration, a church judica-

tory existed, clothed with jurisdiction and supreme authority in the premises, which had formally passed upon the ecclesiastical question involved, and its judgment is therefore final and binding upon the civil tribunals under all approved American authorities.

Complaint is also made because oral argument was heard in the absence of two members of the court. The granting of such argument in this case, after its transfer from

22. the Appellate Court, was exceptional, and was done on motion of the court for its own purposes, and not as a matter of right to the parties. No basis of complaint can be founded on such action.

The case has received such careful and conscientious consideration from the entire court as its manifest importance deserved, and our conclusion is in accord with the overwhelming preponderance of judicial authority upon the same question in other jurisdictions. *First Presbyterian Church, etc.,* v. *First Cumberland Presbyterian Church* (1910), 245 Ill. 74, 91 N. E. 761.

We are without any misgiving as to the soundness of the legal conclusions heretofore announced, and the petition for a rehearing is overruled.