BARKLEY et al. v. HAYES et al.

## SYNOD OF KANSAS OF THE PRESBYTERIAN CHURCH IN THE UNITED STATES OF AMERICA et al. v. MISSOURI VALLEY COLLEGE et al.

(District Court, W. D. Missouri, W. D.   August 16, 1913.)

Nos. 3,540 and 3,546.

1. RELIGIOUS SOCIETIES (§ 18*)—CHURCH PROPERTY—RIGHT OF CONTROL.

A member of the Presbyterian Church or of the Cumberland Presbyterian Church, under their form of organization, has no individual ownership in any property of the church which has been purchased or conveyed for the general use of a congregation or for general use for religious purposes, nor has the congregation which uses it, but the same is vested in the general church, which through its general assembly has the ultimate power of control, although the conveyance may have been to the trustees of the particular congregation.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 111–129; Dec. Dig. § 18.*]

2. RELIGIOUS SOCIETIES (§ 25*)—NECESSARY PARTIES—PERSONS SUING AS REPRESENTATIVES OF A CLASS—OFFICERS OF CHURCH ORGANIZATION.

Officers of the general assembly of the Presbyterian Church in the United States of America, which is the elective governing body of such church, as representatives of the general membership may maintain a suit in equity to determine property rights of the church.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 154–167; Dec. Dig. § 25.*]

3. RELIGIOUS SOCIETIES (§ 34*)—POWER OF CHURCHES TO EFFECT UNION.

A Christian church, in the absence of anything in its constitution to the contrary, has inherent power to unite with another church, involving the surrender of the name and organization of one of them, where there is sufficient identity of faith to warrant their union.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 209–211; Dec. Dig. § 34.*]

4. RELIGIOUS SOCIETIES (§ 12*)—SUITS RESPECTING PROPERTY RIGHTS.

Where controversies in the civil courts concerning property rights of religious societies of the associated class, having representative bodies vested with ecclesiastical control over the subordinate bodies, are dependent on questions of doctrine, discipline, ecclesiastical law, or church government, as a general rule the decision of such highest tribunal of the organization will be accepted by the courts as conclusive.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 87–98; Dec. Dig. § 12.*]

5. RELIGIOUS SOCIETIES (§ 34*)—UNION OF CHURCHES—LEGALITY—PROPERTY RIGHTS.

Both the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church, which separated from the former in 1813, were of the associated or representative class, each having a central representative general assembly, which was the final arbiter on all questions of doctrine, faith, and discipline and with the concurrence of the several presbyteries determined all questions of church government. The division was caused by the dissent of the Cumberland Presbyterians from the Westminster confession of faith, but the doctrinal standards of the older church were altered from time to time, and, after several years of conference, a plan of "reunion and union" was submitted by the general assembly of each church to its presbyteries, and, having been adopted by the requisite votes, the union was effected at the next meeting of the general assemblies; the united church taking the name of the "Presbyterian Church in the United States of America." *Held*, that the union was within the powers of the bodies which effected it and, on the evidence,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that such powers were regularly and lawfully exercised; that there was no such variance of doctrine between the two churches as to prevent their union; and that its effect was to vest in the united church all property rights of the constituent churches.

[Ed. Note.—For other cases, see Religious Societies, Cent. Dig. §§ 209–211; Dec. Dig. § 34.*]

6. COURTS (§ 365*) — FEDERAL COURTS — AUTHORITY OF DECISIONS OF STATE COURTS.

A single decision of the Supreme Court of a state upon the question of property rights arising out of such church union cannot be held conclusive on a federal court even as to property in such state in a subsequent suit between different parties and involving different property; the question being one of general law and involving property in all the states.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 950, 952, 955, 969–971; Dec. Dig. § 365.*]

In Equity. Suits by James M. Barkley and others against Hugh Hayes and others, and by the Synod of Kansas of the Presbyterian Church in the United States of America against the Missouri Valley College and others. On final hearing. Decrees for complainants.

Frank Hagerman, of Kansas City, Mo., and Virgil V. Huff, of Marshall, Mo. (J. W. Suddath, of Warrensburg, Mo., W. M. Williams, of Boonville, Mo., and John M. Gaut, of Nashville, Tenn., of counsel), for complainants.

W. C. Caldwell, of Trenton, Tenn., S. B. Ladd, of Kansas City, Mo., R. M Reynolds, of Marshall, Mo., and T. B. Allen, of St. Joseph, Mo., for defendants

VAN VALKENBURGH, District Judge. These are cases brought by representatives of the Presbyterian Church in the United States of America to define the status of a large number of church properties in the state of Missouri. The first commonly called the "Church Case," is brought by the moderator and stated clerk, who are, respectively, chairman and secretary of the Executive Commission of the General Assembly of the Presbyterian Church in the United States of America, who act individually and as such officers and representatives of the members of said Presbyterian Church, against certain representative members of those who claim to form the Cumberland Presbyterian Church, to which church it is conceded that the property which is the subject of this litigation originally belonged. This property consists of numerous churches located in various parts of this state, and used for purposes of congregational worship.

The second suit is brought by the Synod of Kansas of the Presbyterian Church in the United States of America, a religious corporation organized and existing under the laws of Kansas, and also by certain individuals who are officers, members, and representatives of the Synod of Kansas, a voluntary organization and part of said Presbyterian Church, against the Missouri Valley College, a corporation organized and existing under the laws of Missouri, and certain individual defendants as members, agents, and representatives of what formerly was, and is by them still claimed to be, the Missouri Synod of the Cumberland Presbyterian Church in the State of Missouri, a voluntary religious organization. The controversy arises out of the alleged reunion and union in 1906 of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church. The former church claims that by virtue thereof the property, church, educational,

and otherwise, of the Cumberland Church, passed into the ownership and control of the united church represented by complainants. The defendants, and those whom they represent, deny the validity of the merger, and consequently such resulting effect upon the property involved. The object of the bills is to quiet the title to all the property therein described in the united church, to wit, the Presbyterian Church in the United States of America, fixing and determining the interest acquired therein by virtue of said alleged contract of merger; that the defendants, and all persons acting in concert with them, be enjoined from in any wise interfering with the use by complainants and the members of said united church of any of said property in Missouri held by trustees for the benefit of the Cumberland Church at the time of said merger; that an account be taken of all the property in Missouri heretofore held in trust by the Cumberland Church, and the same be impressed with the right of the united church to the use of the same. In the College Case the relief prayed is to this same effect, varying only to conform to the peculiar nature of the property therein under consideration.

This merger between the two churches, and the title to property claimed thereunder, has been the subject of decision by courts of last resort in twelve states, Alabama, Arkansas, California, Georgia, Illinois, Indiana, Kentucky, Mississippi, Oklahoma, Texas, Tennessee, and Missouri; also, by the District Courts of the United States for the Middle and Western Districts of Tennessee.* Certain preliminary questions have been dealt with by the Supreme Court of the United States.† In all of these jurisdictions except two, to wit, the state Supreme Courts of Tennessee and Missouri, the contentions submitted have been resolved favorably to the complainants in this case. The Supreme Court of the United States, however, has not yet considered what may be termed the full merits of the controversy.

Exhaustive opinions in the several cases heretofore decided should make unnecessary, and indeed unwarranted, a similarly extended discussion in the case at bar. Further accumulative repetition, either of argument or citation, must impose but additional burden upon those seeking the light of precedent. The very great learning, ability, and industry of those who have voiced the judgment of their respective courts have left little that can be supplied with profit in support of the divergent views expressed. These views have been read and considered with the care and interest which their merit and the vast importance of the interests demand, and I shall content myself with announcing

---

*Harris v. Cosby, 173 Ala. 81, 55 South. 231; Sanders v. Baggerly, 96 Ark. 117, 131 S. W. 49; Permanent Committee of Missions v. Pacific Synod, 157 Cal. 105, 106 Pac. 395; Mack v. Kime, 129 Ga. 1, 58 S. E. 184, 24 L. R. A. (N. S.) 675; First Presbyterian Church of Lincoln v. First Cumberland Presbyterian Church of Lincoln, 245 Ill. 74, 91 N. E. 761, 19 Ann. Cas. 275; Fussell v. Hail, 233 Ill. 73, 84 N. E. 42; Fancy Prairie Church v. King, 245 Ill. 130, 91 N. E. 776; Pleasant Grove Congregation v. Riley, 248 Ill. 604, 94 N. E. 30; Ramsey v. Hicks, 174 Ind. 428, 91 N. E. 344, 92 N. E. 164, 30 L. R. A. (N. S.) 665; Bentle v. Ulay, 175 Ind. 494, 94 N. E. 759; Wallace v. Hughes, 131 Ky. 445, 115 S. W. 684; Carothers v. Moseley, 99 Miss. 671, 55 South. 881; First Presbyterian Church v. Cumberland Presbyterian Church, 34 Okl. 503, 126 Pac. 197; Brown v. Clark, 102 Tex. 323, 116 S. W. 360, 24 L. R. A. (N. S.) 670; Boyles v. Roberts, 222 Mo. 613, 121 S. W. 805; Landrith v. Huggins, 121 Tenn. 556, 120 S. W. 783; Helm et al. v. Zarecor et al. (D. C. M. D. Tenn., No. 3,590) 213 Fed. 648; Sherard et al. v. Walton et al. (D. C. W. D. Tenn., No. 669) 206 Fed. 562.

†Helm et al. v. Zarecor et al., 222 U. S. 32, 32 Sup. Ct. 10, 56 L. Ed. 77; Sharpe v. Bonham, 224 U. S. 241, 32 Sup. Ct. 420, 56 L. Ed. 747.

the conclusions I have reached with no more elaboration than is thought to be required for clearness of understanding. Even so, the discussion is unavoidably extended.

The Cumberland Presbyterian Church had its origin in 1810, through certain ministers of the Presbyterian Church who had separated themselves from the parent organization because of differences in doctrinal belief. The church grew until it embraced many churches, presbyteries, and synods, and a general, assembly. From time to time throughout the succeeding century a reunion of the two churches was considered and desired by both associations. Their form of organization and methods of administration were practically identical, They were kept apart by what seemed to be distinctive and controlling differences in faith. In 1903, the Presbyterian Church, through the authoritative voice of its general assembly, made such an explicit revision and interpretation of its doctrinal standards as, in the opinion of the general assembly of both churches, removed all substantial differences between them and rendered their reunion not only possible, but desirable. In 1906 that union was declared to be effected. It did not meet with unanimous approval in the Cumberland Church. A strong minority opposed it from the outset, and still contests its validity; and it is claimed that the properties, church and educational, of the Cumberland Church as it theretofore existed, remain in and should be devoted to the use of those who still adhere to the separate organization and claim to be the legitimate representatives of the latter church.

[1] In resolving the many questions presented, some of which meet us at the threshold of the case, it will aid materially if we first determine the essential character of Presbyterian—and by this I mean also Cumberland Presbyterian—property; how it is held, by and for whom, and in what such Presbyterian property rights consist. In this church the religious congregation or ecclesiastical body holding the property is but a subordinate member of the general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control, more or less complete, in some supreme judicatory over the whole membership of that general organization. The local congregation is itself but a member of a much larger and more important religious organization, is under its government and control, and is bound by its orders and judgments. Therefore, when the property held by the church is that purchased or conveyed for the general use of the religious congregation, not devoted forever by the instrument which conveyed it nor by any specific declaration of its owner to the support of any special religious dogmas, or any peculiar form of worship, it is and remains the property of the general church which exercises such general and ultimate power of control. It does not belong to the particular congregation which uses it, much less to the individual members of such a congregation. It does not belong to the presbytery or the synod, nor, in a strict sense, to the general assembly. It belongs to the church which is composed of its entire membership; that membership being governed and controlled by the organic law of the church, the administration of which is lodged in certain judicatories rising, in regular succession, to the general assembly or court of last resort, embracing in itself legislative, administrative, and

judicial powers. The government of the Presbyterian Church is republican and representative in character. Its administration is vested, not in the individual members, not in the congregations, but in the general assembly and the presbyteries; and the church as a whole, acting through its supreme governing bodies, exercises the ultimate rights of ownership and control over all its properties.

The Constitution of the United States and of the several states guarantees to the individual absolute independence of religious belief and worship. He need associate himself with no religious organization if he does not wish to do so, and he need remain identified with one no longer than he may desire; but when he does unite with a church, and becomes a member of that ecclesiastical body, he voluntarily surrenders his individual freedom to that extent. So long as he desires to avail himself of such a relationship, and to enjoy the privileges and benefits flowing from that association, he must conform to the laws by which it is governed. He cannot complain if its articles of faith be changed, nor if its property—in which he has no individual ownership—be transferred under constitutional forms; in such case, he has no personal or property rights which the civil courts can or should protect. Any other view would be entirely subversive of the very theory of organization. The church would be dissolved into a mere aggregation of individual views and theories. It is impossible that all men, or even many men, should exactly agree upon all the incidental details of standards or policies. It is the substance that is important; and it is essential that the power of decision in such matters should be lodged somewhere, and should be final.

It is otherwise where property is devoted forever by the instrument which conveys it, or by specific declaration of its owner, to the support of any special religious dogmas or any peculiar form of worship. But, in this case, no such question is involved. The deeds to the various properties in the Church Case convey substantially in this form: "To ——— trustees of the ——— Cumberland Presbyterian Church of ——— and their successors." It is broadly argued by defendants that the conveyance of property to particular trustees or officers of a particular congregation of that church in its denominational name would be presumed and held to have created a specific trust for the benefit of that congregation, and for the support therein of the distinctive doctrines of that church. If by this is meant that this form of words creates a specific trust for the teaching of special religious dogmas, or a peculiar form of worship which shall be forever insusceptible of change or of being conducted by any legitimate successor in any other name, I am unable to agree with counsel for defendants. The grant is general in its nature, and, so long as any existing religious congregation can be ascertained to be that congregation or its regular or legitimate successor, it is entitled to the use of the property. Such is undoubtedly the overwhelming weight of decision, both federal and state.

[2] I have discussed this proposition at somewhat unusual length, because to my mind the conclusion reached has a controlling effect upon the solution of several other points in controversy. The question of essential parties to this litigation is immediately suggested. In over-

ruling the pleas to the jurisdiction, which were broadly construed as objections for want of indispensable parties, this court permitted defendants in their answer to avail themselves of the defenses urged by such pleas, and its order was made without prejudice to the right to join them with other matter in any appropriate manner that might be desired. In the memorandum filed I said that I could not on plea take judicial notice of the extent of the custody, control, and management vested in such omitted parties by the church under its rules and ordinances; that the nature of the interest and character of the possession claimed, or asserted, depended upon the construction to be placed upon the church organizations involved, and their power over the church properties concerned. The evidence presented confirms me in the opinion that the properties of the church are held in the manner stated. Watson v. Jones, 13 Wall. 679, 20 L. Ed. 666; Westminster Church v. Trustees of New York Presbytery, 142 App. Div. 855, 127 N. Y. Supp. 836–850. Therefore the plaintiffs are entitled to sue in their representative capacity as members of a class without the joinder of other parties, who, as mere title holders, are not indispensable. Sharpe et al. v. Bonham, 224 U. S. 241, 32 Sup. Ct. 420, 56 L. Ed. 747; Helm v. Zarecor, 222 U. S. 32, 32 Sup. Ct. 10, 56 L. Ed. 77. Independently of other considerations, diversity of citizenship confers jurisdiction.

The same reasoning applies to the College Case. There, out of abundance of caution, the Synod of Kansas, as an incorporated body, was joined with members of the voluntary association, who sued as members of a class. In my opinion, the latter alone were sufficient if my view as to the character of church ownership be correct. The reports of the committee on education to the Missouri Synod of the Cumberland Presbyterian Church in 1874, and the action of the synod thereon, disclose the reasons for the establishment of Missouri Valley College:

"The educational conflict of the day is between secular education, which regards man as simply a skilled producer, and a mere social animal, and Christian education in which the way of salvation is scripturally pointed out, and in which no instruction is given, which is opposed to the principles of the gospel. With the triumph of the latter, we may reasonably expect the church to prosper; with that of the former she must be circumscribed in her influence and usefulness.

"We therefore infer the imperative necessity of a college of high grade for the success of our church in this valley.

"We as a synod are unable to maintain such an institution, as the history of the past clearly teaches.

"That you propose to the other synods of Missouri, and such adjacent synods as may not be officially connected with other institutions, to unite in establishing and maintaining a first-class college to be under the joint control and management of said synods."

The synod adopted the suggestion made. For convenience the college was incorporated, and upon the synods of Missouri and Kansas were conferred supervisory control and visitorial power. The college did not indeed belong to the synods or either of them. It belonged to the general church of which they were subdivisions. The case, in this respect, falls directly within the doctrine announced in Helm et al. v. Zarecor, 222 U. S. 32, 32 Sup. Ct. 10, 56 L. Ed. 77. The college as

incorporated lost none of its essential qualities as an agent of denominational service when it became an artificial person, clothed with power to hold property in a corporate capacity. The following language of Mr. Justice Hughes has special application here:

"It is thus evident that the controversy transcends the rivalries of those claiming membership in the board and the assertion of rights inhering in that corporation itself. It embraces the fundamental question of the rights of these religious associations, said to be represented by the respective parties, to use and control the corporate agency and to have the benefit in their denominational work of the corporate property. * * *

"The board is simply a title holder; an instrumentality, the mastery of which is in dispute. But, as it is the holder of the legal title, the complainants seek a decree defining, in the light of the proceedings alleged in the bill, the equitable obligations arising from the nature and purpose of the corporate organization."

It is manifest that the bringing in of additional parties is desired, not for the purpose of a more complete determination of the controversy, but to defeat the jurisdiction of this court. Fortunately, however, this entire matter has been foreclosed by the decision of the Supreme Court in the cases cited.

The decision of these cases must rest upon the answers to be made to the following questions:

First. Had the Cumberland Church power, express, implied, or inherent, to unite with the Presbyterian Church?

Second. If so, was that power properly and legally exercised? And, as corollary to the latter question,

Third. Was there sufficient identity of faith to warrant union?

[3] The first of these questions has been answered in the affirmative by all courts which have dealt with this controversy—the Supreme Court of Missouri alone excepted. The Supreme Court of Tennessee, which decided in favor of the Cumberland Church upon other grounds, has stated the rule with especial force and completeness. It said:

"The implied power of union of one Christian church with another, involving the surrender of the organization of one of them, exists, where there is no explicit pronouncement to the contrary in their constitution, religious standards, or forms of government. There is nothing in the constitution or organization of the Cumberland Presbyterian Church to indicate that it was intended to be a perpetual organization, so that it had or has the power, if properly exercised, to unite with the Presbyterian Church in the United States of America." Landrith et al. v. Hudgins et al., 121 Tenn. 556, 120 S. W. 783.

I think there can be no doubt of the correctness of this conclusion. To support it, it is unnecessary to seek express authority in the constitution itself. It is not necessarily, nor even preferably, based upon the power conceded to be lodged in the general assemblies and presbyteries to amend and alter the standards of faith; nor that in the general assembly to receive under its jurisdiction other ecclesiastical bodies whose organization is conformed to the doctrine and order of the church. The power to unite with another church is inherent in sovereignty. It is repugnant to all conceptions of progress and development, with the increased vitality and power for good in larger fields that flow therefrom, to hold that a church once formed must exist forever as a separate entity, under a separate name, and without prac-

tical verbal change in its declarations of faith. It is true probably that name and doctrinal standards may be altered and amended by procedure expressly indicated in the constitution, but here the specific thing thus provided for is not in terms attempted. It cannot, on that ground, be insisted that some other action, clearly within the inherent powers of the church, and consummated by the sovereign powers of the church acting within the limits of necessarily implied authority, must be invalid. Unnecessary circuity is not demanded. If, as an incident to this union, the name of the church is changed, and the verbiage of its confession of faith in some degree altered, it does not follow that the union is void.

[4] It remains to be seen whether this union was regularly effected by the sovereign powers of the church. The Supreme Courts of Missouri and Tennessee were of opinion that it was not. All other courts thus far have decided that it was. The latter conclusion has been reached largely, though not exclusively, upon the principle that the Cumberland general assembly, its court of last resort, had jurisdiction to decide this question, and decided in the affirmative, and that the civil courts are bound by this decision. The same supreme judicatory of the Cumberland Church also decided that the doctrinal standards of the two churches were in such substantial accord as to warrant the union. By the constitution the general assembly is given final power to decide in all controversies respecting doctrine and discipline. Concerning the Presbyterian Church in the United States—in this respect no different from the Cumberland Church—the Supreme Court, in Watson v. Jones, 13 Wall. 679, 727 (20 L. Ed. 666), said:

"In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority, is that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."

It is unnecessary to prolong the discussion upon this phase. I think the question of regularity in effecting this union, and of substantial identity in the faith of the two churches, was finally and conclusively determined by the general assembly of the Cumberland Church.

The Supreme Court of Missouri, in Boyles et al. v. Roberts et al., 222 Mo. 613, 121 S. W. 805, held that property rights were here involved, and that in such case civil courts do not register as their own the church decrees, even on matters of doctrine and of faith, but investigate them for themselves. And if, in determining the civil or property rights of the parties, it becomes necessary to investigate the articles of faith of a church and the written documents of its judicatories, that will be done, even to the extent of determining whether or not those judicatories have put the right meaning upon these articles. The same doctrine was announced by the Supreme Court of Tennessee in Landrith v. Hudgins, supra. In order to maintain this proposition it was necessary to discredit the doctrine announced by the Supreme

Court in Watson v. Jones. The principles announced by Mr. Justice Miller for the latter court can be most succinctly, but comprehensively, stated by quoting from the syllabus:

"Controversies in the civil courts concerning property rights of religious societies are generally to be decided by a reference to one or more of three propositions: (1) Was the property or fund which is in question devoted by the express terms of the gift, grant, or sale by which it was acquired, to the support of any specific religious doctrine or belief, or was it acquired for the general use of the society for religious purposes, with no other limitation? (2) Is the society which owned it of the strictly congregational or independent form of church government, owing no submission to any organization outside the congregation? (3) Or is it one of a number of such societies, united to form a more general body of churches, with ecclesiastical control in the general association over the members and societies of which it is composed?

"In the first class of cases the court will, when necessary to protect the trust to which the property has been devoted, inquire into the religious faith or practice of the parties claiming its use or control, and will see that it shall not be diverted from that trust.

"If the property was acquired in the ordinary way of purchase or gift, for the use of a religious society, the court will inquire who constitute that society, or its legitimate successors, and award to them the use of the property.

"In case of the independent order of the congregation, this is to be determined by the majority of the society, or by such organization of the society, as by its own rules constitute its government.

"In the class of cases in which property has been acquired in the same way by a society which constitutes a subordinate part of a general religious organization with established tribunals for ecclesiastical government, these tribunals must decide all questions of faith, discipline, rule, custom, or ecclesiastical government.

"In such cases, where the right of property in the civil court is dependent on the question of doctrine, discipline, ecclesiastical law, rule, or custom, or church government, and that has been decided by the highest tribunal within the organization to which it has been carried, the civil court will accept that decision as conclusive, and be governed by it in its application to the case before it.

"The principles which induced a different rule in the English courts, examined and rejected as inapplicable to the relations of church and state in this country, and an examination of the American cases found to sustain the principle above stated."

As we have seen, the property in dispute was acquired for the general use of the body for religious purposes, with no other limitation. The church is of the associated and not of the congregational class. Therefore the right of property involved is dependent on questions of doctrine, discipline, ecclesiastical law, rule, custom, and church government, which have been decided by the highest tribunal within the organization, and the civil courts will accept that decision as conclusive, and be governed by it in its application to the case before it. In other words, the property right here involved is an incident merely to questions within the jurisdiction of the Cumberland general assembly which have been finally decided by that court of last resort; and so, with but two exceptions, the courts have held.

"It may be that cases may arise wherein the decision of the ecclesiastical tribunal is so palpably erroneous, or so manifestly in excess of its jurisdiction, that the civil courts ought to decline to be bound thereby. Such, however, is not the case here." Carothers v. Moseley, 99 Miss. 671, 678, 55 South. 881, 882.

Such a situation was ably discussed in Mack et al. v. Kime et al., 129 Ga. 1, 23, 58 S. E. 184, 194 (24 L. R. A. [N. S.] 675). It was there said:

"There is a radical difference between an abandonment of all the teachings and doctrines of a church and a mere difference of opinion among the members of an organization as to what are the true doctrines and teachings of the organization. There may be cases where an entire abandonment will be attempted, and such intention would be clear and palpable. But the cases which are most apt to arise are those which are upon the border line, when it is hard to determine, in the particular case, whether the action of the constituted authorities of the church is an abandonment of its original teachings or merely a judicial determination as to what are the true teachings of the church. The fact that there are cases lying so near to this border line is the reason that there are apparently conflicting decisions by the courts in this country as to when it is proper for the civil courts to interfere in the affairs of an ecclesiastical organization. It is true, in this class of cases, as it is in every case arising under the law, that the civil courts have generally laid down the correct rule, that they will not interfere with the affairs of an ecclesiastical organization, where the rights of property are involved, unless there has been a palpable attempt by the governmental authorities of the church to abandon altogether the teachings of the original organization."

The exception to the rule is thus stated in Brundage et al. v. Deardorf et al. (C. C.) 55 Fed. 839:

"The decisions of the supreme judicatory of a religious denomination of the associated class, having a constitution and governed by local, district, state, and national bodies, are not conclusive upon the courts, when they are in open and avowed defiance, and in express violation, of the constitution of such body."

In Ramsey et al. v. Hicks et al., 174 Ind. 428, 442, 91 N. E. 344, 350 (30 L. R. A. [N. S.] 665), the principle is thus stated:

"The recital of portions of the constitution of the Cumberland Church and the proceedings of its general assembly in this opinion was not for the purpose of reviewing the facts and determining for ourselves the correctness of the conclusion reached, but chiefly to show that the question considered and decided was wholly ecclesiastical, that the proceedings were fairly regular and not founded upon a naked usurpation of authority. If church judicatories proceed palpably without jurisdiction, and their action is clearly ultra vires, neither the church membership nor the civil courts should respect their decisions; but when the matter in controversy is purely of ecclesiastical cognizance, and the church tribunal proceeds in manifest good faith under color of authority, its decision upon the question of its own jurisdiction, as well as upon subsidiary questions, is binding upon the civil courts."

The same court, in Bentle v. Ulay, 175 Ind. 494, 496, 94 N. E. 759, has thus further elaborated its statement:

"That both bodies are representative in form and character, and not independent or congregational, is the controlling fact in the case. It is not denied, but is in fact conceded, that, upon all questions of doctrine, faith, and discipline, the highest judicatory in each of the former organizations was the final arbiter. When the highest judicatory in each therefore agreed upon the unity of the doctrine and faith of each, the practice already being virtually the same, and this was followed by a submission of the question of union in the manner provided by the organic law of each organization for the submission of all questions, through the designated representatives, there necessarily resulted in fact, as well as in law, a union under the adopted name, and with it passed the title to all property not impressed with some other trust, such as might distinguish it."

See, also, Brown v. Clark, 102 Tex. 323-333, 116 S. W. 360, 24 L. R. A. (N. S.) 670.

[5] While it is thus established by undoubted weight of authority that the decision of the supreme judicatory of the Cumberland Church that a valid union was effected, both in form and in substance of doctrinal standards, is conclusive and must be accepted by the civil courts, it is unnecessary to base this conclusion wholly upon that ground. I think it conclusively appears, from what has preceded, that that church had inherent power to enter the union. In what body or bodies of the church was that power lodged? By whom is the sovereignty of the church properly exercised?

"Presbyterian church government is representative in form. Neither the constituent churches nor the members thereof legislate directly for themselves. The congregation of a church only elects the ruling elders who compose the church session, and the session in turn selects one of its members as a representative in presbytery. The sovereignty of the church is exercised by the general assembly and the presbyteries acting together; the assembly proposing legislation, and the presbyteries approving or disapproving. They act for the whole church, and the will of a majority of all the presbyteries, acting with the general assembly, expresses the will of all the particular churches. It is essentially a government of the majority. All things which are done by the church as a whole are, according to the letter of the constitution, done by the assembly and presbyteries, and all of the inherent powers of the church as a whole reside in those representative bodies. They constitute the residuum of all the powers, executive, legislative, and judicial, not expressly lodged elsewhere by the constitution. Therefore, when the union was decreed by those bodies, the will of the whole church was spoken." Sanders v. Baggerly, 96 Ark. 117, 129, 130, 131 S. W. 49, 54, 55.

See, also, Landrith v. Hudgins, supra; Fussell v. Hail, 134 Ill. App. 634; Committee of Missions v. Pacific Synod of the Presbyterian Church, etc., 157 Cal. 105, 106 Pac. 395.

But it is insistently urged that, even though the church had the power to unite, that power was unconstitutionally and irregularly exercised. The various steps in the procedure covered a period of years. A committee on fraternity and union was appointed by the general assemblies of both churches. They made a report, submitting a plan of reunion and union of the two churches, together with concurrent declarations to be adopted by their respective general assemblies meeting in 1904, and other recommendations. This plan of reunion and union of the two churches was as follows:

"We believe that the union of the Christian churches of substantially similar faith and polity would be to the glory of God, the good of mankind, and the strengthening of Christian testimony at home and abroad.

"We believe that the manifest providential developments and leadings in the two churches since their separation, together with present conditions of agreement and fellowship, have been and are such as to justify their reunion.

"Therefore, we cordially recommend to your respective general assemblies, that the reunion of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church be accomplished as soon as the necessary steps can be taken, upon the basis hereinafter set forth.

"1. The Presbyterian Church in the United States of America, whose general assembly met in the Immanuel Church, Los Angeles, Cal., May 21st, 1903, and the Cumberland Presbyterian Church, whose general assembly met in the First Cumberland Presbyterian Church, Nashville, Tenn., May 21st, 1903, shall be united as one church, under the name and style of the Presbyterian

Church in the United States of America, possessing all the legal and corporate rights and powers which the separate churches now possess.

"2. The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards, and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice.

"3. Each of the assemblies shall submit the foregoing Basis of Union to its presbyteries, which shall be required to meet on or before April 30th, 1905, to express their approval or disapproval of the same by a categorical answer to this question:

"Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church in the United States on the following basis: The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice?

"Each presbytery shall, before the tenth day of May, 1905, forward to the stated clerk of the assembly with which it is connected, a statement of its vote on the said Basis of Union.

"4. The report of the vote of the presbyteries shall be submitted by the respective stated clerks to the general assemblies meeting in 1905, and if the general assemblies shall then find and declare that the foregoing Basis of Union has been approved by the constitutional majority of the presbyteries connected with each branch of the church, then the same shall be of binding force, and both assemblies shall take action accordingly."

This plan was submitted to the presbyteries in the following form:

"Presbyterial Vote on Organic Union.

"To the ...... Presbytery:

"Dear Brethren: By referring to the minutes of the last meeting of the general assembly (pages 25, 55a, 30, 55, 48), you will see that, in the constitutional manner, the assembly has submitted to the presbyteries a proposition pertaining to the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church, and you are asked to give due consideration to the same and to vote thereon. This proposition is to be put before the presbytery in the following terms:

"Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church on the following basis: The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards, and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired word of God, the only infallible rule of faith and practice?

"To this question the presbytery is to give categorical answer. While the vote is taken simply upon this question, your action thereon will mean the acceptance or rejection of the entire plan, embracing the Basis of Union, Concurrent Declarations, and recommendations, without amendment or alteration in any part. (See Minutes, pages 62a–65a.)

"For the information of the presbyteries, the amendments to the Westminster Confession of Faith and the Brief Statement of the Reformed Faith have been printed in the assembly minutes. (See pages 72–77.)

"The vote of the presbytery is to be taken on or before April 30, 1905, and the accompanying certificate of the vote is to be returned to the assembly's stated clerk before the tenth day of May, 1905.

"W. E. Settle, Moderator,
"J. M. Hubbert, Stated Clerk.

"Marshall, Mo., September 6, 1904."

It is argued that the categorical question thus submitted for answer did not include the proposal that the churches should be united as one church under the name and style of the Presbyterian Church in the United States of America; that the presbyteries voted only upon the doctrinal basis. Even if this were true, it would scarcely be sufficient to defeat the union as a whole. The name to be borne by the united church was of secondary importance. It must be assumed that that church would have some name. If there were an entire change of name, that of the Cumberland Church would obviously be abandoned. If that of either of the churches entering the union were to be retained, it could hardly be anticipated that that of the parent church with its 1,300,000 communicants would give way to that of the smaller organization with less than 200,000. But I am of opinion that the entire plan was submitted by this categorical question, and the circular letter which placed it before the presbyteries. In the letter this appears:

"To this question the presbytery is to give categorical answer. While the vote is taken simply upon this question, your action thereon will mean the acceptance or rejection of the entire plan, embracing the Basis of Union, Concurrent Declarations, and recommendations, without amendment or alteration in any part. (See Minutes, pages 62a–65a.)"

Reference to pages 62a to 65a of the minutes of the general assembly of the Cumberland Church discloses the entire plan of reunion and union of the two churches, including the proposed adoption of the name and style of the Presbyterian Church in the United States of America as that of the united church. The practice of submitting long and involved propositions in abbreviated form by categorical questions to be answered by yes or no is very common. As was well said in Sanders v. Baggerly, 96 Ark. at page 139, 131 S. W. at page 57:

"Is it conceivable that the ministers and members composing the presbyteries did not understand, when they voted an answer to the question set forth in the letter of the moderator and stated clerk, that they were approving or disapproving the whole plan of union on the basis of taking the name and adopting the doctrinal and ecclesiastical standards of the Presbyterian Church? We think not. * * *

"The proceedings were not conducted along technical lines, and should not be subjected to a technical scrutiny which would defeat the obvious intention of those who participated. The presbyters are presumed to have been men of at least average intelligence; and it is also to be presumed that they possessed themselves of all the facts concerning the whole plan of union and the effect of the votes which they were called on to cast. Nothing, it seems to us, could be plainer than the manner in which the plan was submitted, and we are unwilling to say that it was or could have been misunderstood by the members of the presbyteries. We say that the whole plan was submitted to and adopted by the presbyteries."

But it is further insisted that the doctrinal and ecclesiastical standards of the churches are so far at variance that no valid union was possible. To this, again, as a matter of independent decision, I cannot agree. When the Cumberland Presbyterian Church was founded, its first synod, which met in 1813, formulated and established a brief statement setting forth the points wherein Cumberland Presbyterians dis-

sented from the Westminster Confession of Faith. They were as follows:

"1. That there are no eternal reprobates.

"2. That Christ died not for a part only, but for all mankind.

"3. That all infants dying in infancy are saved through Christ and the sanctification of the Spirit.

"4. That the Spirit of God operates on the world, or as coextensively as Christ has made atonement, in such a manner as to leave all men inexcusable."

It may readily be conceded that the Westminster Confession of Faith, in terms, as well as in original construction, did not bear such interpretation; but the power to construe and declare its doctrinal standards was vested in the general assembly of the Presbyterian Church. Those standards were from time to time materially modified and altered. In 1903 the general assembly of the Presbyterian Church in the United States of America issued a declaratory statement, together with new chapters, in which, among other things, it was said:

"The Presbyterian Church in the United States of America does authoritatively declare as follows:

"First, with reference to chapter III of the Confession of Faith: That concerning those who are saved in Christ, the doctrine of God's eternal decree is held in harmony with the doctrine of His love to all mankind; His gift of His Son to be the propitiation for the sins of the whole world, and His readiness to bestow His saving grace on all who seek it. That concerning those who perish, the doctrine of God's eternal decree is held in harmony with the doctrine that God desires not the death of any sinner, but has provided in Christ a salvation sufficient for all, adapted to all, and freely offered in the Gospel to all; that men are fully responsible for their treatment of God's gracious offer; that His decree hinders no man from accepting that offer; and that no man is condemned except on the ground of his sin.

"Second, with reference to chapter X, section 3, of the Confession of Faith: That it is not to be regarded as teaching that any who die in infancy are lost. We believe that all dying in infancy are included in the election of grace, and are regenerated and saved by Christ through the Spirit, who works when and where and how He pleases. * * *

"The dispensation of the Gospel is especially committed to Him. He prepares the way for it, accompanies it with His persuasive power, and urges its message upon the reason and conscience of men, so that they who reject its merciful offer are not only without excuse, but are also guilty of resisting the Holy Spirit."

It is upon the basis of this declaration that the union was adopted. In my opinion, those utterances completely met all the points of difference between the two churches. It is true that the Confession of Faith was not rewritten. It is true that some of the phraseology that had previously been regarded as objectionable was left unchanged. Nevertheless, all such standards are the subject of authoritative interpretation. Perhaps certain sections were left untouched from sentimental considerations; just as certain former Cumberland Presbyterians desire to retain the name "Cumberland" and their literal form of confession for similar reasons. It is the substance and spirit, and not the mere letter, which governs. It is true that some subsequent general assembly might change such declarations and construction; but this is possible in any general assembly with respect to any doctrinal standard, and such power is expressly recognized in the several

constitutions. If I am wrong in my interpretation, it is but a demonstration of the soundness of the established rule that judges of the civil courts should leave such questions to those more learned in ecclesiastical law, and more competent to decide them aright. The general assembly of the Cumberland Presbyterian Church, in accordance with its constitutional powers, undertook to discharge this duty, and I concur in its decision.

Counsel for defendants urge that some fraud and misrepresentation appears on the part of those representing the Presbyterian Church, in that the effect of the vote in presbytery was misstated, and that a vote in assembly was unduly precipitated. This feature of the case received no attention at the oral argument. It does not seem to have been presented in earlier cases in other jurisdictions. It probably has its origin in individual misunderstanding; sincere, no doubt, but scarcely justifying such serious consideration. As was intimated in a former decision, and is undoubtedly the general rule, the presence of fraud would justify a court in taking cognizance of a question otherwise left for final determination to some other tribunal; but a charge of fraud against a great religious organization should not be entertained except upon clear proof. The evidence in this case does not measure up to that standard.

[6] Finally, it is urged that the decision of the Supreme Court of Missouri in Boyles v. Roberts, supra, should be binding upon this court in the cases at bar. That decision cannot be accorded such force. There is identity neither in parties, subject-matter, nor relief prayed. Furthermore, a single case cannot establish a rule of property, and that decision was rendered long after the rights of the parties under this union had accrued. Kuhn v. Fairmount Coal Co., 215 U. S. 349, 30 Sup. Ct. 140, 54 L. Ed. 228, and cases cited. It is claimed, however, that a rule of property was established in Missouri by a consistent line of previous decisions. Watson v. Garvin, 54 Mo. 353; Russie v. Brazzell, 128 Mo. 93, 30 S. W. 526, 49 Am. St. Rep. 542; Fulbright v. Higginbotham, 133 Mo. 676, 34 S. W. 875. The only principle laid down in those cases which could in any way be urged as a rule of property applicable to this case is that, where property rights are involved, the civil courts will not be bound by the decisions of the ecclesiastical courts, even on matters of doctrine and faith. If this be a rule of property, it must, to be effective here, constitute a rule of real property, and, as such, affect the rights of the parties, the modes of the transfer, and the solemnities which should accompany them. Suydam v. Williamson, 24 How. 427-433, 16 L. Ed. 742. This is not such a rule. It indicates merely a practice of the Missouri courts which establishes no rights, modes, or solemnities, but affects the procedure by which such rights may indirectly be determined. It applies, moreover, if at all, to church property, and no other. The Presbyterian Church, as, indeed, all other associated ecclesiastical bodies, owns property throughout the various states of the Union. It has a code of ecclesiastical law, which is general and not local, and the interpretation thereof, and the fundamental nature of the organi-

zation, it would seem, are matters of general law not subject generally to conclusive local construction.

In such cases, the federal courts will exercise their independent judgment. Swift v. Tyson, 16 Pet. 1, 10 L. Ed. 865; Burgess v. Seligman, 107 U. S. 20–33, 2 Sup. Ct. 10, 27 L. Ed. 359; Bucher v. Cheshire R. Co., 125 U. S. 555, 8 Sup. Ct. 974, 31 L. Ed. 795; Kuhn v. Fairmount Coal Co., 215 U. S. 349, 30 Sup. Ct. 140, 54 L. Ed. 228. However, the Supreme Court of Missouri in State ex rel. Watson v. Farris et al., 45 Mo. 183, adopted the rule herein announced. The case of Watson v. Jones, 13 Wall. 679, 20 L. Ed. 666, was based in part upon the authority of that decision, which is expressly cited. In such case, this court would not feel at liberty to change the rule in any event, but is constrained to follow that laid down by the Supreme Court in Watson v. Jones, supra. Pease v. Peck, 18 How. 595–598, 15 L. Ed. 518. We have here no case involving a state statute nor long established local customs having the force of law. State law, especially of this character, is not to be applied by United States courts, when sitting as courts of equity, as rules of decision. Bucher v. Cheshire R. Co., 125 U. S. 555, 8 Sup. Ct. 974, 31 L. Ed. 795; Michie's Encyc. of U. S. Sup. Ct. Rep. vol. 4, p. 1051. Entertaining, as I do, profound respect for the Supreme Court of this state as well as for the able jurist who wrote the opinion in Boyles v. Roberts, I am firmly of the conviction that the doctrine therein announced is in conflict with the great weight of authority, state and federal; and that it is founded upon a misapprehension of the true rule which should govern the civil courts in their treatment of decisions of ecclesiastical courts of last resort in cases such as are now before us.

The Cumberland Church separated from the mother church because of specific doctrinal differences. These differences have been removed. The Cumberland Church, from the outset, has cherished hopes of reunion, and has several times in the past century made and entertained overtures to that end. The title "Plan of Reunion and Union" significantly describes the attitude and feeling of the two churches. They had inherent power to reunite; they made a reasonable and bona fide attempt to exercise this power, and I believe successfully. We should not demand from church judicatories the literal exactness and precision in matters of procedure that are expected and required in the civil courts under more technical rules of practice. The united church is better equipped to spread its doctrines and to advance the cause of civilization and religious education. This union was conceived and consummated with that worthy object in view. As indicated by the Supreme Court in Helm v. Zarecor this controversy transcends the rivalries of the contending parties. It embraces the fundamental question of the right of these religious associations to use and control and have the benefit of these agencies in their denominational work. It involves the success or failure of an ambition century-old, that all those who have embraced substantially the tenets of Presbyterianism should work together with greater power and vitality for universal betterment. The case should receive a broad and liberal construction in harmony with this beneficent purpose.

It follows, from the conclusions reached, that in the Church Case the title to all the property therein described should be quieted in the Presbyterian Church in the United States of America; that the defendants, and each of them, and all other members of the former Cumberland Presbyterian Church, whom they represent, be enjoined from in any wise interfering with the use by complainants, and the members of the Presbyterian Church in the United States of America, of any of the property in Missouri therein described, held by trustees for the benefit of said Cumberland Church at the time of the union of said churches; that in the College Case it be adjudged that the defendants, except the Missouri Valley College, and all those claiming under and represented by them, have no right or title in or to said real estate, and no right or title, legal or equitable, to said trust funds therein described, and no right to the control or possession thereof; that said Missouri Valley College be adjudged to be vested with the legal title to said property, real and personal, in trust, for the benefit of complainants and those whom they represent, to wit, the Presbyterian Church in the United States of America; that the defendants, except said Missouri Valley College, and every person claiming under and represented by them, be forever estopped, debarred, and enjoined from in any way claiming or asserting any title thereto, or in any way interfering with or attempting to interfere with, manage, or control, said property—all to the effect that said Presbyterian Church in the United States of America may use and control, and have the benefit of, said properties in its denominational work.

Decrees may be prepared in conformity with this opinion.